27 So.3d 1223 (2009)
BOARD OF WATER & SEWER COMMISSIONERS OF the CITY OF MOBILE
v.
BILL HARBERT CONSTRUCTION COMPANY and Federal Insurance Company.
1041091.
Supreme Court of Alabama.
July 31, 2009.
*1225 E.J. Saad and James H. Crosby of Crosby Saad, LLC, Mobile; and James E. Atchison of The Atchison Firm, Mobile, for appellant.
Edward P. Meyerson, Susan S. Wagner, and James H. White of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Birmingham, for appellees.
James G. Wyly III and Kyle S. Moran of Phelps Dunbar, LLP, Gulfport, Mississippi; and Richard O. Kingrea of Bonner Landreau Kingrea LLC, Foley, filed a brief on behalf of ATC Group Services, Inc.
PER CURIAM.
The Board of Water & Sewer Commissioners of the City of Mobile ("the Board") appeals from a summary judgment in favor of Bill Harbert Construction Company ("Harbert") and Harbert's surety, Federal Insurance Company ("Federal"). The summary judgment, which the trial court certified as final under Rule 54(b), Ala. R. Civ. P., adjudicated claims made by the Board arising out of Harbert's performance of two construction projects for the Board, as hereinafter discussed.[1]

I. Factual Background and Procedural History
In 1992, the Board retained BCM Converse, Inc. ("BCM"),[2] to perform engineering and related consultation services for two projects associated with the Board's Clifton C. Williams Wastewater Treatment Plant. One project ("Project 15") involved, *1226 in part, the construction of a large reactor basin known as reactor basin # 2.[3] The other project ("Project 16") involved modifications and improvements to a sludge-treatment facility. BCM prepared the plans and specifications for the projects, and the Board then requested bids for the construction of the projects.
Harbert bid upon and was awarded the construction contracts for both Project 15 ("Contract 15") and Project 16 ("Contract 16"). Pursuant to the contracts, Harbert agreed to complete the respective projects in accordance with the plans and specifications prepared by BCM and in accordance with the Board's "Standard Specifications for Water Mains, Sanitary Sewers and Sewage Pumping Stations" ("the standard specifications"). The price for performing the work under Contract 15 was approximately $11,106,963, and the price for performing the work under Contract 16 was approximately $1,298,125. Taking into account extensions granted by the Board, the work under Contract 15 was required to be completed on or before December 26, 1996, and the work under Contact 16 was required to be completed on or before May 2, 1996.[4] Federal agreed to act as Harbert's surety for both contracts, and Harbert and Federal executed and delivered surety bond documents in favor of the Board for each project.
The primary issue in the present appeal concerns whether the Board's terminations of Contract 15 and Contract 16 were proper and the effect of those terminations on the Board's claims against Harbert that were adjudicated by the summary judgment.
As a preliminary matter, we note that the standard specifications describe BCM's role in the projects, including the following:
"5.01 AUTHORITY OF THE ENGINEER:

"To prevent misunderstandings, disputes, and litigation, [BCM] shall decide any and all questions which arise concerning the quality and acceptability of materials furnished and work performed, the rate of progress of the Work, interpretation of the Plans and Specifications, and the acceptable fulfillment of the Contract on the part of [Harbert]. [BCM] will determine the amount, quantity, classification, and quality of the several kinds of work performed and materials furnished which are to be paid for under the Contract and [its] decision and estimate shall be conclusive and binding on both parties thereto and such decision and estimate of [BCM], in case any questions arise, shall be a condition precedent to the right of [Harbert] to receive any money due [it] under the contract. Explanations concerning the meaning of the Plans and Specifications and Contract, all directions necessary to complete or make definite the Plans, Special Provisions, Specifications or Contract and to give them due effect will be given by *1227 [BCM] and [its] findings shall be final and binding on both parties hereto. [BCM] shall have authority to enforce and make effective decisions and orders as apply to conformance with the Contract. [It] shall decide disputes and mutual rights between Contractors."
The standard specifications further provided, however:
"7.16 NO WAIVER OF LEGAL RIGHTS:

"The [Board] or [BCM] shall not be precluded or stopped by any measurement, estimate, or certificate made or given by either of them before or after the completion and acceptance of the Work and payment therefor, pursuant to any measurement, estimate, or certificate, from showing the true and correct amount and character of the Work performed and materials furnished by [Harbert]; or from showing at any time that any such measurement, estimate, or certificate is untrue or incorrectly made in any particular; or from showing at any time that the Work or materials, or any part thereof, do not conform in fact to the Contract. [BCM] shall have the right to reject the whole or any part of the aforesaid work or materials should the said measurements, estimate, or payment be found, or be known, to be inconsistent with the terms of the Contract, or otherwise improperly given; and the [Board] shall not be precluded from demanding and recovering from [Harbert] and [Federal] such damages as it may sustain by reason of [Harbert's] failure to comply with the terms of the Contract. Neither the acceptance by [BCM], or any representative or employee; nor any certificate by [BCM] for payment of money; nor any payment for nor acceptance of the whole of any part of the Work by the [Board], or [BCM]; nor any extension of time; nor any possession taken by the [Board] or its employees, shall operate as a waiver of any portion of the Contract or of any power herein reserved by the [Board] or of any right to damages herein provided, nor shall any breach of the Contract be held to be a waiver of any other or subsequent breach."
We also note that subsection 8.11 of the standard specifications, entitled "Default of Contract," provided for notices of default and termination. Subsection 8.11 states:
"If [Harbert] ... fails to perform the work with sufficient workmen, equipment or materials to insure its prompt completion, or performs the Work unsuitably, or neglects or refuses to remove materials or perform anew such work as shall be rejected as defective and unsuitable, or discontinues prosecution of the Work, or from any other cause whatsoever does not carry the Work in an acceptable manner, ... the [Board] or [its] representative may give notice in writing by registered mail to [Harbert] and [Federal] of such delay, neglect, or default. If within 10 days after such notice [Harbert] does not proceed to remedy to the satisfaction of the [Board] the fault specified in said notice, or [Federal] does not proceed to take over the Work for completion, the [Board] shall have full power and authority, without impairing the obligation of the Contract or the Contract Bonds, to take over the completion of the Work;... to enter into agreements with others for the completion of the Contract according to the terms and provisions thereof; or to use such other methods as in its opinion may be required for the completion of the Contract. [Harbert] and [Federal] shall be liable for all costs and expenses incurred by the [Board] in completing the Work, and also for the *1228 liquidated damages in conformity with the terms of the Contract."

A. Further Factual Background as to Project 15

1. The Combiflex System
Contract 15 required that reactor basin # 2 be constructed to satisfy certain pressure tests. To help maintain pressure in the reactor basin, the plans and specifications for Project 15 required the use of the Sikadur-Combiflex System ("the Combiflex system"), manufactured by Sika Corporation ("Sika"). The Combiflex system consisted of strips of foam "glued or welded" over seams that existed at joints between the concrete slabs and T-sections that were used to construct the reactor basin.
After Harbert entered into Contract 15, it entered into a subcontract with Spiderman's Professional Services, Inc. ("Spiderman"), pursuant to which Spiderman agreed to install the Combiflex system on reactor basin #2.[5] Spiderman purchased the Combiflex system from a supplier. In October 1996, after Harbert had constructed reactor basin # 2, Spiderman completed the installation of the Combiflex system, allegedly in accordance with the plans and specifications for Contract 15 and in accordance with on-site directions of a representative from Sika.[6]
In October 1996, both Sika and Spiderman issued their respective warranties as to any defects in material and or workmanship associated with the Combiflex system. Subsection 7.14 of the standard specifications provided that Harbert "shall accept final responsibility for completion and final acceptance of the overall Project including work done by subcontractors and material and equipment provided by vendors and suppliers."
After Spiderman installed the Combiflex system, construction continued on the rest of Project 15. Disputes arose between Harbert and some of its subcontractors, on the one hand, and BCM, on the other, as to certain requirements under Contract 15, including whether the plans and specifications called for the installation of certain "interlock controls." Harbert requested that BCM approve a change order for the interlock controls. During the dispute over the interlock-control change order, BCM requested that Harbert provide the Board with an updated schedule for completing Project 15, particularly when it became apparent that Project 15 would not be completed by the scheduled completion date.
On April 10, 1997, Harbert sent a letter to Joseph N. Asarisi, BCM's "Construction and Service Manager" for Project 15 and Project 16. The letter stated:
"It is impossible for us to provide you with an accurate schedule of completion when there are still items of omission in the contract documents that directly affect *1229 the progress and start up of the plant. We have submitted a Request for Change Order concerning this work and when we receive your go ahead, we will be able to provide you with a schedule.
"I realize you have been asking for a schedule for a while, but with the changing scope of work on the critical path, we cannot furnish you with one."
On April 14, 1997, Asarisi sent Harbert a letter in which he refused to issue the change order Harbert had requested because, according to Asarisi, it was "clear that the interlock controls are required under your contract and no change order is required." The letter further stated that Asarisi "expect[ed] to have an updated schedule in [BCM's] office no later than Friday April 18, 1997"; that BCM would request the bonding company to take over the project if BCM did not receive a satisfactory, updated schedule by that date; and that "liquidated damages [were] continuing to accrue. To date, [BCM] estimate[s] the liquidated damages to be approximately $59,950."
As to liquidated damages, paragraph 6 of Contract 15 states, in part:
"[The Board] may retain the sum of $550.00 per day for each day thereafter, Sundays and holidays included, that the Work remains uncompleted, which sum shall represent the actual damages which the [Board] will have sustained per day by failure of [Harbert] to complete the Work within the time stipulated, and this sum is not a penalty, being the stipulated damages the [Board] will have sustained in the event of such default by [Harbert]."
On April 17, 1997, Harbert forwarded a completion schedule for Project 15 to Asarisi.
At an April 21, 1997, meeting of the Board, BCM updated the Board on the status of Project 15. The minutes of the meeting state, in part:
"The contract time was 600 days, with a starting date of February 13, 1995, and the original completion should have been October 17, 1996. The engineers met in November 1995, telling the contractor we were very concerned about the progress on the project and did not feel the contractor could finish on time. Mr. [John] Stege of Harbert assured us at that time that there was 6 months of float time on their schedule and he was ahead of schedule and would probably finish early. Another meeting was held in November 1996, a month after the original completion date. [BCM] and Board's staff agreed in that meeting to a 70-day time extension which put completion date December 26, 1996. We were assured by Mr. Stege at that time that the new reactor would be on line and the [Board] would have beneficial use. Based on that, we agreed to stop liquidated damages or to not assess liquidated damages at that time until December 26, 1996. However, that reactor is still not on line. [W. Malcolm] Steeves[, assistant director of the Board,] interjected that liquidated damages began December 26.
"Mr. Asarisi [of BCM] said we have a recent schedule from the contractor received last week showing the reactor will be on line first week in June, which is six months later than the contractor originally anticipated.
"....
"... [Mr. Asarisi said] [t]he whole project won't be complete until the first of August.
"... Mr. Asarisi said the contractor probably has enough money in there to finish, but he's saying, once the Board *1230 deducts the liquidated damages from that, then there will be little left. In other words, the Board couldn't finish the job plus collect on the liquidated damages for the amount left in the project."
"....
"Chair [Lewis G.] Odom[, Jr.] said we need to decide to see whether the contractor will meet his own schedule commitment of June or go ahead and refer the matter to the bonding company and ask them to complete the job or both. Can we do both? Mr. Steeves responded that one of the things that has happened is Harbert has replaced the person who came from Atlanta to do this station. This last one that came in January was doing a great job and they have recalled him. We told them they have to get an acceptable schedule to us by Friday. The schedule they gave us is not an acceptable schedule."
In May 2007, reactor basin # 2 failed its first pressure test. Asarisi discussed the pressure-test failure with Harbert and requested that it correct the problem. Asarisi also sent the Board a letter that stated:
"Enclosed are three copies of Estimate No. 23 from ... Harbert ... in the amount of $147,437.73 for work performed [from December 21, 1996, through January 20, 1997] on the referenced project. Liquidated damages have been assessed at the rate of $550 per day for December 27, 1996 to January 20, 1997, totaling $13,750. This amount has been deducted from the total amount due the Contractor.
"We have checked this estimate, find it in order, and recommend that it be paid."
We note that Harbert's "Estimate No. 23" states that 98.58% of the "Contract" was "in place."
In the late spring and early summer of 1997, Harbert and Spiderman made several attempts to correct problems allegedly associated with the installation of the Combiflex system or certain construction problems associated with the reactor basin. Those attempts failed. Thereafter, Spiderman wrote Sika stating that the Combiflex system was not able "to provide an airtight seal at the difficult details at the columns and the T-sections."
On July 14, 1997, Harbert sent Asarisi a letter that stated, in part:
"Since May 1, 1997, when the pressure test of Reactor No. 2 failed due to discovered leaks in the structure's joints,... Harbert has proactively and diligently pursued the repair of these leaks to prevent further delays to this project. As evidenced by our May 7, 1997, letter to ... BCM, we fully complied with [the contract specifications] in implementing a repair procedure based on using the stipulated combiflex polyurethane sealant system manufactured and installed by the Sika Corporation. ... As you are well aware of, it has now been over two months and the repairs have not yielded the expected and intended results that everyone envisioned.
"It is [Harbert's] position, at this point in time, that we have thoroughly exhausted all required means and methods in performing this repair work in accordance to the contract documents and as directed by ... BCM. As of July 11, 1997, we have ceased repair operations until further notice. We are hereby requesting that ... BCM now provide an alternative repair method that will resolve this situation. It is imperative that we receive your response and direction no later than July 17, 1997 to prevent further delay to the start-up of Reactor No. 2 and the timely completion of this project.

*1231 "....
"If you have any questions or require additional information regarding this matter, please feel free to contact this office. We look forward to receiving your direction in completing these repairs to the mutual satisfaction of all parties concerned."
On August 12, 1997, Harbert sent Asarisi another letter. That letter stated:
"[I]t remains unclear as to whether the specified combiflex sealant system was the appropriate product to use at the tees and columns.
"In an effort to expedite the immediate solution of this matter, ... Harbert... has engaged the services of an independent sealant expert to inspect the combiflex sealant system that was previously installed in accordance to [the contract specifications]. This inspection will be conducted on Wednesday, August 13, 1997."
Harbert retained Raymond J. Shutz, a materials consultant, to examine the installation of the Combiflex system on reactor basin #2. After his investigation, Shutz concluded that the Combiflex system was "a good system for many applications," but that it was "not suitable for sealing the double curvature joints which exist between the stems of double Tees and on the top of the columns" in reactor basin # 2.
On August 18, 1997, Harbert sent Asarisi a letter that stated, in part:
"Based on the results of the inspection and Mr. Shutz's assessment thereof, it is the position of ... Harbert ... that ... BCM will now have to select an appropriate alternative method [to seal reactor basin # 2].
"We trust that ... BCM will provide the appropriate repair method accordingly to minimize any further delays that have occurred to the project as a result of this matter. For the record, all work on Reactor No. 2 ceased August 13, 1997. We look forward to receiving a positive response from ... BCM no later than August 22, 1997."
In response, Asarisi sent Harbert a letter dated August 27, 1997, which stated, in part:
"Buddy Bonine from [Sika], will be at the [Project 15 site] on Tuesday, September 2, 1997, to inspect the installation and provide their opinion. As Mr. Steeves has previously indicated, we will provide ... Harbert ... an alternative sealant system to seal the Reactor if [Sika] agrees that the Combiflex system is not suitable for the application."
In September 1997, after Sika inspected Spiderman's installation of the Combiflex system and the attempted repairs to the installation, the Board proposed that a certified Sika installer be hired to remove and then to reinstall the Combiflex system in one of the eight compartments in reactor basin # 2 as a test section. On September 17, 1997, Harbert sent Asarisi and Steeves a letter insisting that BCM approve an alternative sealant system for the reactor basin; the alternative system was subsequently referred to as "Liquid Boot." Harbert's proposed alternative method involved, in part, the removal of the existing sealant from the reactor roof, "reinstallation of a new backer rod; and the sealing of the joint(s) with a two (2) part epoxy material." In its September 17, 1997, letter, Harbert argued its position:
"We believe that the ... proposed method by the [Board] fails to address the real problem. By injecting a requirement that the sealant installer be pre-approved by the very same manufacturer whose product's suitability and integrity is questioned would, at one and the same time, both modify and tighten previously applicable specification requirements *1232 (which did not require the sealant installer to be pre-approved and supervised by the manufacturer), thereby subjectively permitting the sealant manufacturer to control the application, and not the installer. By insisting that the performance of this proposed work be restricted to a certified installer who was never before used on this project and by enabling the continuous supervision by the supplier of the questioned product, it is quite obvious that the application methods and techniques would differ, to some degree, from those of the original installer, Spiderman .... Moreover, the use of this method, if then extended to all seven (7) remaining cells in Reactor No. 2, would drastically increase the cost of repair while not necessarily bringing about a permanent fix, since the inappropriate product would still be used. The [Board] would thus be violating its own duty to mitigate the cost of resolving this problem.
"....
"We would hope that the [Board] would not, in a desperate effort to avoid responsibility for the misapplication of an improperly suited product, attempt to now cover-up the problem by turning once again to the same manufacturer whose product has caused the problem in the first place. It is our steadfast position that we certainly cannot and will not acquiesce to the proposed method and approach by the [Board] in dealing with this problem."
On October 16, 1997, Asarisi sent Harbert a letter stating that BCM had investigated Harbert's recommended alternative method for sealing reactor basin # 2. The letter stated that the sealant system recommended by Harbert had "never been used over structural prestressed tees," and described two specific concerns Asarisi had about the use of the proposed system. The letter concludes: "Based on the information presented we do not recommend the use of Liquid Boot."
Subsection 5.10 of the standard specifications states:
"All work which has been rejected shall be remedied or else removed and replaced in an acceptable manner by [Harbert] at [its] own expense, and no compensation shall be allowed [it] for such removal or replacement. ... Upon failure on the part of [Harbert] to immediately comply with any order of [BCM] made under the provision of this Section [5], [the Board] shall have authority to cause defective work to be remedied, or removed and replaced ... and to deduct the cost from any monies due or to become due [Harbert]. In case no such monies are available, the amount shall be charged against [Federal]."
On October 20, 1997, Asarisi sent Harbert another letter. The October 20 letter did not call on Harbert to reinstall the Combiflex system using a certified contractor selected by Sika. Instead, the letter informed Harbert that the Board had contracted with a
"certified Sika contractor to remove and replace the Combiflex material in one cell ... in Reactor No. 2. The cell will be tested for air tightness before and after the repair is made. If the repair is successful all associated costs will be deducted from money due ... Harbert... in accordance with [subsection] 5.10 of the Contract Documents."
(Emphasis added.) The Board retained Phoenix Coatings, Inc., to remove and reinstall the Combiflex system in a test cell of the reactor basin # 2.[7]
*1233 The communications between the Board and Harbert continued in a letter from Harbert to the Board dated October 27, 1997:
"During our meeting on September 24, 1997,[8] ... it was our understanding that the Board agreed in principle to our proposed `Liquid Boot System' sealant repair method for Reactor No. 2 and that all that was necessary for us to proceed with this work was BCM's acknowledged approval. To date we have yet to receive BCM's approval nor written directive to proceed with the repair work. ...
"In order to avoid any further delays to the project, we request that you promptly intercede in resolving this matter by issuing an immediate notice to proceed with the Liquid Boot System repair. ... Harbert ... reserves its right to seek full compensation for all delay damages resulting from this matter to date."
Asarisi responded in an October 29, 1997, letter to Harbert:
"As you requested, we have reviewed your offer to install a test section of the Liquid Boot before making a final decision to reject it. It is our opinion that a test section would need to be in place about six months to determine the effects of various temperature differentials on the concrete cap and the Liquid Boot. As you know, a delay of this magnitude is not acceptable. We also feel that the drain lines from the mixers you proposed will be a constant maintenance problem. Based on this and our previous correspondence, we cannot recommend Liquid Boot as an acceptable alternative to seal Reactor 2."

2. Disagreements over Load Shedding
During this same time framethe summer and fall of 1997BCM and Harbert had an ongoing dispute concerning certain electrical and instrumentation components for Project 15. In part, the dispute concerned what the parties referred to as "load shedding"; the load-shedding work was to be performed by Duke Instrument Service, one of Harbert's subcontractors on Project 15 and Project 16. During the dispute, Harbert took the position that a change order was needed for load-shedding modifications. In an August 5, 1997, letter to Asarisi, Harbert requested an additional $134,271.40 for proposed change-order work (which included an adjustment to a previous change order) and stated that it was reserving its "right to claim for a fifty-six (56) day compensable time extension impact ... to the projects milestone completion dates that resulted from this extra work." Eventually, BCM agreed to recommend that the Board approve a change order for $14,073.40 for wire and conduit. However, BCM did not recommend that the Board approve the remainder of the proposed load-shedding *1234 change order because Harbert had allegedly failed to provide adequate information to justify the order.
On August 14, 1997, Asarisi sent Harbert a letter, a copy of which it also sent to Federal. That letter stated:
"As you are aware, ... Harbert ... informed the [Board] and BCM in November 1996 that the new Reactor and Clarifiers would be on line by December 26, 1996 and the project would be complete by March 1997. To date, none of this has happened. Our daily records indicate that your present work force consists of 1 superintendent and 3 laborers. We are aware of your efforts to seal Reactor 2. However, there are still a number of items that would keep the project from starting up if Reactor 2 was ready today. We have enclosed a partial list of items that have to be completed before Reactor 2 is put on line. This is not a complete list and there may be other incomplete items that delay start up.
"We are quite concerned about the slow rate of progress on the project and the impact that delays have on the [Board] and the operation of the plant. Therefore, in accordance with [subsection] 8.11 of the [Standard] Specifications you are hereby notified that you have 10 days to start work on each of the items on the enclosed list, with the exception of items that are dependent on the completion of Reactor 2. If work has not begun on all noted items within 10 days the [Board] will notify [Federal] that the project is in default. We trust that you will provide an adequate work force to complete the work within the specified time and to avoid further actions against you."
The list of items enclosed with the letter includes 19 items, one of which is referred to as "load shedding."
On September 10, 1997, Harbert responded by letter to Asarisi's letter dated August 14, 1997. Harbert stated that it disagreed with the "assessment of the project's rate of progress to date" and that it "[took] exception to your threat to declare this contract in default." Harbert asserted that, in part, the completion of Project 15 had been delayed by two contract modifications, which allegedly had delayed the completion date from March 1997 to May 12, 1997. According to Harbert, in the interim, the problems with the sealing of reactor basin #2 occurred. Harbert asserted, "BCM's actions and allocation of responsibility thereof for its role in these project delays are well documented and supported." Harbert also contended that its "manpower level" on Project 15 was "in-line with the amount of work that remains to be completed" and that "the indecisiveness of ... BCM in promptly resolving field issues, specifically the problems associated with Reactor No. 2, has contributed to this project's slow rate of progress." Further, Harbert asserted that "all of the specified items [on the list that accompanied Asarisi's August 14 letter] have already been completed. ... We feel your actions of threat to declare this contract in default are premature and without adequate supporting evidence." (Emphasis added.)
On September 25, 1997, Harbert sent Asarisi a letter arguing that it had provided sufficient information for the approval of the load-shedding change order and stating that a representative of BCM was scheduled to meet with a representative of Duke Instrument Service to discuss the matter further. The letter continued:
"Currently, we are awaiting BCM's next course of action. In the meantime, the work remaining for the load shedding system is on hold and will continue to delay the project until we receive the *1235 required approval and authorization to proceed with the change order work.
"This letter will serve as our final request that BCM issue the appropriate change order, as previously submitted, in the amount of $134,271.40. Short of receiving a positive response from you by October 3, 1997, ... Harbert ... will exercise its legal right to ensure that we receive full compensation, from the [Board] for the above requested amount, including all relevant legal fees."
Based on the foregoing, Harbert evidently considered the load shedding change-order work to be different from the load-shedding item on the list that accompanied Asarisi's August 14, 1997, letter, which it stated had "already been completed."
On October 3, 1997, Asarisi sent Harbert a letter responding to its September 25, 1997, letter. Asarisi stated, in part, that the scheduled meeting had occurred between a representative of BCM and a representative of Duke Instrument Service but that the portion of the change order that was in dispute required the submission of information Harbert still had not provided. The letter continued:
"You state that the work on Load Shedding is on hold until you receive approval and authorization to proceed. However, the Load Shedding design is quite clear and the only outstanding issue is how much extra, if any, [Harbert] is entitled to. This issue has in no way kept you from completing the work and no additional time will be recommended for delays associated with Load Shedding."
(Emphasis added.)
Also on October 3, 1997, Harbert sent Asarisi a letter that stated, in part, that Harbert would
"proceed as stated in accordance to our September 25 letter. At the same time, as an act of good faith, ... Harbert ... is currently proceeding with implementing the load shedding modifications so that flow through Reactor No. 2 will not be further delayed.
"... Harbert ... maintains its position to claim for all compensatory time impact costs to the project's milestone completion dates that resulted from this extra work."
On October 14, 1997, Asarisi sent Harbert a letter accompanied by a memorandum summarizing what occurred at a meeting about the load-shedding issue held on September 16, 1997. The letter closed: "We welcome your comments to this Memorandum." A copy of the letter was sent to Federal.
In response to the memorandum, on October 15, 1997, Harbert sent Asarisi a letter that stated, in part:
"... Harbert ... does not concur with any of BCM's allegations or comments [as to the load-shedding-change-order issue]. Our position on this matter remains unchanged.
"Due to BCM's unwillingness to negotiate in good faith, we will include all outstanding costs for the load shedding modification in our impending litigation claim against the Board ... and BCM.... Any further correspondence on this matter will be issued through [Harbert's] attorney."
Harbert also sent a facsimile transmission to Duke Instrument Service authorizing it to proceed with load-shedding work and stating that it had "informed the [Board] that as an act of good faith we will proceed with this work under protest. [We are] assuming that you will begin this work immediately as to not impede system start-up."

3. Termination of Contract 15
On November 14, 1997, Asarisi informed Harbert by letter, a copy of which was sent to Federal, as follows:

*1236 "It appears that a number of items remain incomplete that will keep the new system from going on line when Reactor 2 is satisfactorily sealed and tested. Most if not all of the items are electrical (i.e. loadshedding, etc.). In order to avoid further delays on this project we request that you provide an updated schedule which includes all work associated with starting the new system. This schedule should be in our office no later than November 24, 1997. Failure to provide a schedule within ten days will be grounds for finding [Harbert] in default of the Contract in accordance with [subsection] 8.11 of the Specifications."
(Emphasis added.) The letter contained no indication that, apart from BCM's request in the letter itself, the contract documents imposed on Harbert the obligation to provide to the Board the particular schedule of work described in the letter or that Harbert had breached its contractual obligations by not having already provided the requested schedule on or before the date of the letter.
The Board held a meeting on December 8, 1997. According to the minutes from the meeting, Asarisi
"said, based on his November 14 letter to ... Harbert[, that] Harbert was asked to provide a schedule of completion and they were given ten days as required in the contract. They failed to provide this within the 10-day time frame and today we still have not received this. It is BCM's recommendation that the Board find Harbert ... in default."
(Emphasis added.) A motion to accept BCM's recommendation carried unanimously.
Also on December 8, 1997, Harbert sent the Board a letter by facsimile transmission and by mail; it is not clear from the record when the letter was received in relation to the Board's December 8 meeting. Harbert's letter stated:
"This letter will serve as our official notice to the [Board] that the actions and/or lack thereof by your engineer, BCM ..., have now delayed the project an additional seventy-five (75) calendar days. Specifically, these delays are: (1) the timely approval of our proposed `Liquid Boot' repair method and (2) the slow rate of progress by your contractor, Phoenix Coatings, in repairing the sealant at one cell of Reactor No. 2.
"....
"To date, your engineer, BCM ..., continues to reject our proposed `Liquid Boot' repair method even though this system has proven to be successfully applied in other treatment plants throughout the country. In contrast to the work being performed by Phoenix Coatings, the `Liquid Boot' system can be installed, tested and completed within two or three weeks. Your approval and acceptance of this method will not only allow for Reactor No. 2 to be put into operation much sooner but also will mitigate any further delays to the project's start-up testing and completion dates.
"We trust that you share our concerns and will act accordingly towards bringing this project to completion."
The letter makes no reference to Asarisi's request for an updated schedule for Project 15.
In a letter dated December 9, 1997, Asarisi informed Federal that
"[t]he Board ..., in conference December 8, 1997, voted to terminate ... Harbert['s] contract on [Project 15]. A copy of the resolution will be forwarded to you when we receive it. ... Harbert ... is hereby notified to cease all work related to this project. We request that Federal ... provide a schedule of their *1237 plan of action to complete the remaining work on the project. Please let us have this schedule by January 5, 1998."
(Emphasis added.) A copy of the letter was sent to Harbert.
The record contains an undated resolution from the Board that states:
"WHEREAS, on November 14, 1997 the Board ... as party to the contract with ... Harbert ... for [Project 15] declared Harbert to be in default and properly notified Harbert and Harbert's surety, Federal ..., by registered mail of said default and;
"WHEREAS, the Board has allowed Harbert in excess of ten days from the date of default notice to remedy the deficiencies documented by various letters and multiple meetings between the parties to the project and;
"WHEREAS, Harbert has failed to remedy the deficiencies under the contract;
"It has been moved, ratified and affirmed by vote of the Board on December 8, 1997, that ... Harbert ... cease all work on said project and the contract with ... Harbert ... be terminated."[9]
(Emphasis added.)
After the Board terminated Contract 15, Harbert left the Project 15 site. Neither Harbert nor Federal performed any further work under Contract 15. The Board used other contractors to complete Project 15.

B. Further Factual Background as to Project 16
After Harbert began work on Project 16, it requested an extension of time to complete the project. On May 9, 1996, Asarisi sent Harbert a letter that stated:
"The Board in conference May 9, 1996, received your report on the status of this project. Your recommendation was accepted by the Board to allow a 70-day contract time extension expiring April 28, 1996, and to assess liquidated damages for any period after that in accordance with the terms of the contract."[10]
The liquidated-damages provision for Contract 16 was identical to that for Contract 15, as discussed above.
On May 24, 1996, Harbert sent Asarisi a letter requesting "a final inspection on [Project 16] as we are substantially complete."
On June 4, 1996, Asarisi sent Harbert a letter that stated:
"We received your May 24, 1996 letter requesting final inspection on the referenced project. We agree that the project is substantially complete and document this by letter.

*1238 "Our field representative feels that a number of minor touch-up and clean-up items need to be addressed before we have a final inspection with the [Board]. He has provided a list of these items to the Project Superintendent. When these items are complete we will conduct a final inspection."

(Emphasis added.)
At a June 6, 1996, meeting BCM updated the Board on the status of Project 16. The minutes of the meeting state, in part:
"Mr. Asarisi explained that in a previous Board meeting, the Board authorized liquidated damages to be assessed [against] Harbert ... on this project. Following that action, the contractor substantially completed the work. The system is operable; there are some punch-list items and the project has not been finally accepted. [BCM's] representatives met with the contractor along with Board staff and discussed liquidated damages."
(Emphasis added.) Harbert was informed that the Board had decided to adhere to its decision to assess liquidated damages. Harbert protested the assessment of liquidated damages on the ground that it had not caused the delays at issue.
On June 18, 1996, Asarisi sent Harbert a letter that stated:
"In accordance with [subsection] 5.14 of the [standard specifications], a final inspection was conducted on [Project 16] on June 14, 1996. With the exception of the items listed on the enclosed Punch List, the project was substantially complete on May 24, 1996, and was placed on 30-day maintenance as of June 14, 1996.

"If the project is maintained in accordance with the Specifications and all punch list items are satisfactorily completed, the work will be ready for final acceptance on July 15, 1996.
"You should now begin advertising completion of the project as required by the [standard specifications]. A sample Advertisement of Completion is provided on page 1 of the attached Final Inspection/Punch List."
(Emphasis added.) The punch list Asarisi enclosed with his June 18, 1996, letter included 5 items relating to the "Secondary Digester Building," including the replacement of certain pipe supports and the insulation of "small water lines on boiler"; 20 items relating to the "Centrifuge Structure," including the application of certain clamps, finishing "chutes on centrifuge discharge," replacing broken belts, replacing drive bearings, labeling various control items, and installing "PVC check valve in polymer lines at centrifuges"; and 8 "General" items, including the provision of "record drawings," "Operation and Maintenance Manuals," "spare parts," "performance testing on the centrifuges (emphasis added)," and the correction of "deficiencies on attached letter dated June 6, 1996."[11]
We note that, in regard to the completion and acceptance of Project 16, subsection 5.13 of the standard specifications, entitled "Project Completion," states: "The Work shall be complete when all pay items and any Extra Work to be performed under this Contract [are] performed in [their] entirety and in accordance with contractual requirements." (Emphasis added.) Subsection 1.47 of the standard specifications defines "Work" as "[t]he entire completed construction or the various separately identifiable parts thereof required to be furnished under the Contract *1239 Documents." (Emphasis added.) The standard specifications further state:
"5.14 FINAL CONSTRUCTION INSPECTION:

"Whenever [BCM] considers the Work provided and contemplated by the Contract is nearing completion, or within 10 days after being notified by [Harbert] that the Work is completed, [BCM] will inspect the Work included in the Contract. If [BCM] finds that the Work has not been satisfactorily completed at the time of such inspection, [it] shall advise [Harbert] in writing as to the Work to be done or the particular defects to be remedied. When these defects have been remedied and the Work has been satisfactorily completed [BCM] shall make the Final Inspection, and shall notify [Harbert] in writing that the Final Inspection has been made and that time charges end on the day of Final Inspection. Maintenance Period shall start on the day after this Final Inspection.
"5.15 FINAL ACCEPTANCE:

"After the Final Inspection is made as outlined above, [Harbert] shall maintain the Work for 30 days in the same manner as set forth under [subsection 4.08] `Maintenance of the Work During Construction.' The Work will be finally accepted at the end of the 30 day maintenance period provided all work has been satisfactorily maintained.

"[Harbert], immediately after receiving the letter of Final Inspection, shall give notice of said completion of Work by an advertisement in some newspaper of general circulation published within the city or county wherein the Work has been done for a period of four successive weeks. ...
"In no instance shall a final settlement be made upon [Harbert] until the expiration of the Maintenance Period and until the Contract is completed and Project accepted by the [Board].

"5.16 MAINTENANCE GUARANTEE AFTER ACCEPTANCE:

"Neither the final certificate of payment nor any provisions in the Contract nor partial or entire use or occupancy of the premises by the [Board] shall constitute an acceptance of work not done in accordance with the Contract or relieve [Harbert] of liability in respect to any express warranties or responsibility for faulty materials or workmanship. [Harbert] shall remedy any defects in the Work and pay for any damage to other work resulting therefrom which shall appear within a period of one year from the date of final acceptance of the Work unless a longer period is specified. The [Board] will give notice of observed defects with reasonable promptness and [Harbert] shall repair the defects immediately. [Harbert's] Performance or Contract Bond shall remain in effect and cover this guarantee. After completion of the Project and prior to final acceptance, [Harbert] shall provide a statement addressed to the [Board] from [Federal] acknowledging that the Contract Bonds will remain in effect during the one-year warranty period. Final payment under the Contract will not be made until this statement is received."
(Emphasis added.)
Subsection 4.08 of the standard specifications, entitled "Maintenance of the Work During Construction," states:
"[Harbert] shall be required to maintain the Work from the date of the approval of [its] Contract until the Work is completed and shall maintain it in first-class condition for 30 days after it is completed and until the Work is finally accepted.

"The maintenance shall consist of continuous and effective work prosecuted *1240 day by day, with adequate equipment and forces to the end of the Project, keeping the entire work site in satisfactory and acceptable condition at all time.
"Compensation for maintenance work during construction and before the Work is finally accepted shall be included in the Contract unit prices bid on the pay items of the Work and the [Board] will not pay additional for such work."
(Emphasis added.)
After it received Asarisi's June 18, 1996, letter, Harbert published an advertisement of completion in the Mobile Press Register, a daily newspaper published in Mobile, for four consecutive weeks beginning July 11, 1996.
On August 9, 1996, Asarisi sent a letter to Harbert that stated:
"Enclosed for your information is a letter from the Board ... which states that liquidated damages will be assessed on [Project 16]. Our records indicate that the contract completion date, after the approved 70-day time extension[,] was May 2, 1996. The system was put into service on May 24, 1996. There was a 21 day overrun in time at $550 per day which is equal to $11,550 liquidated damages. This amount will be deducted from final payment on the project.
"We would also like to remind you that one of the conditions for acceptance of the Sharpies[12]centrifuge was performance testing after installation to confirm compliance with the performance requirements of the specifications. This testing is required before the project will be final accepted. Please give at least 48-hours notice prior to testing."
(Emphasis added.)
Harbert submitted a final payment request for Project 16. On September 13, 1996, Asarisi sent a letter to Harbert that stated:
"Regarding your September 4, 1996 request for final payment on the referenced project, we have listed the following reasons for denying the request:
"* We have not received a reply to our July 2, 1996 letter regarding the PLC signals specified and required for proper operation of the sludge system.

"* The sludge pumps continue to fail to start. This has been a problem since the pumps were installed.

"* The conditions of the enclosed letter from Sharpies have not been met.
"* All of the punch list items are not complete.

"* The project has not been final accepted and will not be until all of the above items are complete."
(Emphasis added.)
On March 14, 1997, Asarisi sent a letter to Harbert that stated:
"[Project 16] was originally scheduled to be completed in February 1996, but remains incomplete. We have notified you numerous times of the problems that exist with the project and have requested that they be corrected. Several items from the May 1996 Punch List have never been completed. Although attempts have been made to correct the problems with the centrifuges, they have been without success. Other Punch List items have never been addressed.

"We just learned this morning that both centrifuges are not operating. Liquidated damages were previously assessed *1241 on this project last year but stopped in May when both centrifuges were up and running. Now that both centrifuges are not operating the Board will begin assessing liquidated damages again, starting today, at $550 per day in accordance with the contract for every day that either one of the centrifuges is not operating.

"The loss of this system has a large impact on the operation of the plant and results in significant costs to the Board. We can no longer recommend further delays in the project completion to the [Board]."
(Emphasis added.)
On March 17, 1997, Harbert responded to Asarisi's March 14, 1997, letter as follows:
"[We] have received your letter ... dated March 14, and have spoken with Marvin this morning concerning the centrifuge structure. A technician is already on site and has dismantled, cleaned and started the centrifuge back into operation. He is going to send us his report on the problem which will indicate operator error since there was absolutely nothing wrong with the equipment. As far as the other centrifuge, he is replacing a bearing and also installing rings to prevent the buildup of sludge in the bowl. The shut down of the eastern most centrifuge had nothing to do with uncompleted work.
"We are making every effort to have the remaining critical items, such as the PLC panel, strainers and centrifuge operation completed this week along with misc. punch list items such as traffic bollards, touch up painting, screws and nuts, etc. We still have the close out documents to turn in and various other items of paperwork to complete but these will not hold up operation of the system."
(Emphasis added.)
On April 2, 1997, Asarisi sent a letter to Harbert stating that BCM had inspected the centrifuge PLC on March 21, 1997, and listing several items that it said were not complete. The letter stated that "[a]ll of these items need to be added or finished before the system can be accepted," and that "[w]e remind you that liquidated damages are accruing until final acceptance of this project."
At an April 21, 1997, meeting of the Board, BCM updated the Board on the status of Project 16. The minutes of the meeting state, in part:
"The Board did have beneficial use of the facility on May 24, 1996. Chair [Odom] is aware liquidated damages were assessed for 21 days of $11,550 on that project. Since that time, the project should have [been] completed and has not. March 14 both centrifuges went down and the contractor was notified that he was back on liquidated damages, not just only to when the centrifuges were running but, until the project was 100% complete and satisfactory. The contractor got the centrifuges back up that same week; however, he still remains to complete the project as of to date.
"... The contractor has informed that the Board cannot assess liquidated damages if the Board has beneficial use of it.
"Chair Odom asked what is needed to get the project completed. Mr. Asarisi responded there is a computer control system that has never been complete. The contractor has been stalling. They told us it was ready and [BCM's] instrumentation individual checked it and found pieces missing which were required under the contract and were not provided. The contractor is in the process *1242 of correcting those although no work has been seen on it. The centrifuge supplier is supposed to be in the 28th of this month to do some performance testing. That still will not complete the project.

"They have been told the PLC (Computer Controls) will probably be completed within the month. This is a year over the time of completion.

"[Assistant director W. Malcolm] Steeves stated the only option we have is to go to the bonding company and tell them to take over. We don't think the bonding company can proceed faster than what's going on now. This has been one of the most poorly managed projects of Harbert ...; it seems this has been a learning project for them. There is no excuse for this type delay. For that reason, we decided to tell the contractor we are going to assess liquidated damages every day. We may use up all the rest of the contractor's money with liquidated damages. That is what the contractor will be arguing.
"Mr. Asarisi stated that to date we have enough money to complete the project. Mr. Steeves stated that we are holding enough money to complete the project without the contractor should we decide to do that. The contractor is getting tight about our charging $550 per day while we are using the system. Our response is that it is costing us money not to have this project completed. We can't use it like we are supposed to be able to. We have to keep running here and there to turn on this pump and this valve and we are paying the consultants to continue to work on this project. We are experiencing a cost that we can justify charging them $550 per day if we decide to. We are in that position and we will let the contractor move us off that position by finishing the project. We are very unhappy about this project. The centrifuges work well when they work and will save us money."
(Emphasis added.)
Harbert again submitted a final payment request to BCM. On June 16, 1997, Asarisi sent Harbert a letter rejecting the payment request and noting that "there are a number of punch list items that have never been addressed. The original punch list is over a year old. Since you did not make corrections within the allowed 30 day time period a new inspection will be required."
On July 8, 1997, Asarisi sent Harbert a letter that stated:
"A Final Inspection was conducted on the referenced project on June 18, 1996. Enclosed is a copy of the original Punch List Items that were to be completed within 30 days of the inspection. Over a year has passed since the inspection was made and some of the Punch List Items still have not been completed. You were also notified by Certified Mail on March 14, 1997 that both centrifuges were down and that liquidated damages would be assessed in the amount of $550 per day until the project was 100 percent complete and final accepted. A copy of this letter is enclosed. To date, liquidated damages exceed $61,000. Also, additional deficiencies have shown up since the original inspection. A current list of these Punch List Items is enclosed.

"We have tried unsuccessfully for over a year to get ... Harbert ... to complete this project. In accordance with terms of the Contract, you are hereby notified that the work on the remaining items must begin within 10 days of the date of this letter. If all work on this project is not 100 percent complete by July 27, *1243 1997 we may notify your bonding company to complete the work."
(Emphasis added.) A copy of the letter was sent to Federal. Included with the July 8, 1997, letter was a punch list containing 88 items to be addressed; many of the items included several subitems. Some of the items were the same matters described on the punch list from June 1996.[13]
On July 15, 1997, Harbert sent Asarisi a letter in response to his July 8, 1997, letter. Harbert disputed some of the factual statements in Asarisi's letter of July 8, and it claimed that it had corrected
"all of the deficiencies noted on the `Final Inspection/Punch List' ... with the exception of equipment 0 & M manuals and job site photographs. This information will be provided at one time, as previously directed by ... BCM.
Harbert's July 15, 1997, letter then quoted from a portion of subsection 5.14 of the standard specifications, see discussion, infra, and continued:
"It is the position of ... Harbert ... that our work was satisfactorily completed with all defects having been remedied prior to ... BCM conducting its final inspection on June 14, 1996. When the project was placed on a 30-day maintenance period on June 14, 1996, all noted punch list/deficiency items were considered warranty items. We feel that the eighty-eight punch list report enclosed in your July 8, 1997 letter are warranty related issues that only preclude final project acceptance.
Harbert also disagreed with Asarisi's position concerning liquidated damages:
"As evidenced by the attached field report from Sharpies, dated March 17, 1997, both centrifuges were functioning properly and have been operating henceforth.... BCM's continued assessment of liquidated damages is not justified and without merit.
"... Harbert ... will continue to strive towards closing out this project to the satisfaction of the [Board]."
(Emphasis added.)
On August 8, 1997, Asarisi sent a letter to Harbert that stated:
"We can assure you that the `Work' has never been `satisfactorily completed.' You claim that the list of eighty-eight items that are deficient on the project are warranty items. Even if this were the case, it has been over a year since the original inspection was made and the items are still not corrected. Some of the items on this list are things that were supposed to be included in the project and are not there as of today. You cannot consider something missing on the project as a warranty item.

"... Our March 14, 1997 letter said that liquidated damages would be assessed until `all' items were corrected and the Project was Final Accepted.[14] This has *1244 not been done and we have not seen any effort being made to correct the items."
(Emphasis added.)
Also on August 8, 1997, Asarisi sent Federal a letter that stated:
"By copy of our July 8, 1997 letter to... Harbert ... you were notified that the [Board] could find [it] in default of [Contract 16] if all work was not completed by July 27, 1997. The work was not completed by this date and we are not aware of any work being performed at this time. Therefore, in accordance with [subsection] 8.11 of the Contract, the Board ... finds ... Harbert ... in default of [Contract 16]."
(Emphasis added.) The letter closed: "Your prompt attention to the resolution of this matter will be appreciated." The letter reflects that a copy was sent to Harbert. Harbert responded via a letter to Asarisi that closed: "Contrary to your allegations,... Harbert ... will complete this project in accordance to our contract and reserve its right to seek legal action, as deemed necessary."
On August 25, 1997, Asarisi sent Federal a letter that stated that neither Federal nor Harbert had remedied the default identified in the letter of August 8, 1997, and that the Board would exercise its right to take over the completion of the "Work." A copy of the letter was sent to Harbert.
On September 10, 1997, Harbert responded in a letter to Asarisi that took exception with the decision to declare Contract 16 in default. Harbert reiterated its position that it had completed all work under Contract 16 "in accordance with" the June 18, 1996, punch list. The letter closed:
"Contrary to your decision, ... Harbert... will complete this project in accordance to our contract agreement and we will seek the necessary legal action to ensure that this happens."
(Emphasis added.)
On September 11, 1997, Asarisi sent Harbert a letter that stated:
"We were informed by your project superintendent that he plans to begin work on the items remaining on [Contract 16]. Previous attempts to complete the work by your crews has generally resulted in only a few items being corrected before pulling off the job again. This lack of action is the cause for finding... Harbert ... in default. Any work left incomplete after this attempt will be contracted out and payment will be made with money held on the project as stipulated in the Contract."
(Emphasis added.)
On November 14, 1997, Asarisi sent a letter to Harbert that stated:
"Over five weeks have passed since our October 7, 1997 meeting to discuss deficiencies on [Project 16]. To date, we have not seen any progress on the work. As you know the Board has declared ... Harbert ... in default. At your request we allowed [Harbert] to proceed with completing the project. Again, we fail to see any progress being made. If we do not receive a schedule by November 21, 1997 which shows an acceptable progress rate for completing the work, we will continue with the default process."
On November 21, 1997, Harbert sent a letter to Asarisi that stated Harbert's position that it "ha[d] diligently pursued the performance and completion of all warranty related work ... since our October 7, 1997 meeting" and that it "strongly disputed BCM's ... allegation that ... Harbert... continues to be in default of its contract." Harbert again asserted that the June 18, 1996, punch list was the final *1245 punch list for Contract 16. Harbert contended that it "ha[d] completed all `warranty' items shown on this list." Harbert also stated:
"With regards to your request for a completion schedule, the majority of the warranty work remaining to be completed is electrical/instrumentation related. As such, we have notified Duke Instrument Service to provide a completion schedule to us as soon as possible. We expect to receive this information from Duke in the next week. Upon our receipt of their schedule, we will promptly forward this to you."
On November 24, 1997, the Board voted to terminate Contract 16 and to "file against the bond." The Board adopted a resolution that stated that it had declared Harbert in default in a letter dated August 8, 1997; that Harbert had been given "in excess of ten days from the date of default notice to remedy the deficiencies documented by various letters and multiple meetings between the parties"; and that "Harbert ha[d] failed to remedy the deficiencies under the contract." "It has been moved, ratified, and affirmed by vote of the Board ... that ... Harbert ... cease all work on said project and the contract with ... Harbert be terminated."
In a letter to Federal dated December 3, 1997, a copy of which was sent to Harbert, Asarisi informed Federal of the Board's decision to terminate Contract 16; it requested that Harbert cease all work under Contract 16; and it demanded that Federal "provide a schedule of [its] plan of action to complete the remaining work on the project." A copy of the letter was sent to Harbert. As discussed in Part I.A.3., a few days later the Board also terminated Contract 15.
After the termination of Contract 16, neither Harbert nor Federal corrected the alleged deficiencies. The Board used other contractors to repair and complete the work allegedly left undone by Harbert under Contract 16.

C. Procedural History
In December 1999, Harbert sued the Board in the Mobile Circuit Court. In part, Harbert alleged claims against the Board of breach of contract as to both Contract 15 and Contract 16. Specifically, Harbert alleged that the Board had wrongfully terminated both Contract 15 and Contract 16 and that, as a result of Board's breach of the contracts, Harbert had suffered damages totaling "in excess of $3,165,728," including
"not less than $769,386 for extended field overhead costs, $515,088 for extended home office overhead costs, $389,965 for the direct cost of changed/additional work on the Projects..., $172,762 for unpaid work under the Contracts, $672,858 for the contract retainage withheld, and $247,988 of accrued interest costs, plus $397,681 in additional bonding company, claim preparation, and attorneys' fees."
The Board filed counterclaims against Harbert and a third-party complaint against Federal.[15] The Board's counterclaims against Harbert included claims of breach of contract as to both Contract 15 and Contract 16 and of fraud as to each project.[16] The Board's breach-of-contract *1246 claims included allegations that Harbert failed to properly perform all of the work required under the contracts; that Harbert failed to correct deficiencies in the work it performed; that Harbert failed to perform the work in a timely manner; that Harbert failed to provide qualified personnel to complete the projects; that Harbert failed to properly perform change orders; and that Harbert failed to perform the work in a workmanlike manner. The Board alleged that, as a result of Harbert's breaches, "the Board has suffered damages in that the projects have not been completed properly, and expenses have been incurred and continue to be incurred to properly complete the Project[s]." In its counterclaims, the Board sought damages that included, in part, "all repair costs incurred by the Board, including but not limited to all payments made to correct and/or complete Harbert's errors and/or omissions" (emphasis added) associated with the correction or completion of Harbert's deficient work, liquidated damages as provided in the contracts, certain regulatory penalties allegedly incurred by the Board because of Harbert's alleged "delay and/or poor workmanship," and "all other damages not specifically defined herein incurred by the Board as a result of Harbert's breach of both contracts."
The Board's fraud claims state, in pertinent part:
"27. Harbert represented to the Board that it could perform the work as specified in the plans and specifications or fraudulent[ly] suppressed material facts.

"28. The representations made by Harbert were false and Harbert knew there were false[;] or were false, and Harbert, without knowledge of the true facts, recklessly misrepresented the facts; or were false and were made by Harbert by mistake, but with the intention that the Board should rely on them.
"29. The Board relied on the representations made by Harbert and relied on them and acted upon them by awarding the contract work to Harbert.

"30. As a proximate result of ... Harbert's misrepresentations, the Board has suffered damages in that the projects have not been completed properly, and expenses have been incurred and continue to be incurred to properly complete the Project[s]."[17]
(Emphasis added.) The counterclaim describes the damages sought by the Board on the fraud claims in the same terms the Board used for its breach-of-contract claims, except for the addition of an allegation that the Board was entitled to punitive damages for Harbert's alleged "intentional or gross and reckless" conduct.
*1247 The Board also filed a third-party complaint against Federal based on Federal's surety obligations.
In August 2002, Harbert filed a motion for a partial summary judgment, asserting as follows:
"1. There is no genuine issue of material fact (a) that the Board terminated [Contract 16] ... after the work was substantially complete and (b) that the Board terminated [Contract 15] ... without providing Harbert with notice of default and 10 days opportunity to cure as required by the terms of Contract 15.
"2. Therefore, Harbert is entitled to judgment as a matter of law that the Board's termination of Contracts 15 and 16 was wrongful."
As to the termination of Contract 15, as part of its narrative summary of undisputed facts in support of its motion for a partial summary judgment, Harbert directed the trial court's attention to subsection 8.11 of the standard specifications. See discussion, supra. Harbert also directed the trial court's attention to subsection 8.12 of the standard specifications, entitled "Termination for Failure of Performance," which states:
"In the event of failure by [Harbert] to perform any and all of [Harbert's] obligations in a prompt and efficient manner satisfactory to the [Board], the [Board] will have the right to summarily terminate this agreement, including all work covered hereby, by giving [Harbert] written notice of such termination, after which the [Board] may employ contracting services of his choice to complete the Work under this Contract and [Harbert] and [Federal] will reimburse the [Board] any additional costs which may result from such termination and employment of other contracting services. Failure by the [Board] to exercise this right to so terminate this Contract for any such default by [Harbert] shall not constitute a waiver by the [Board] of its right to so terminate this Contract for any subsequent default."
In Harbert's brief in support of its motion for a partial summary judgment, Harbert argued, as to Contract 15, that the Board failed to strictly comply with the terms of subsection 8.11 governing "notice of default and the opportunity to cure before terminating the contract." Specifically, Harbert argued that it was entitled to "clear and unequivocal" notice of default and opportunity to cure any default it might have committed and that "the Board met and voted to place Harbert in default, but, instead of declaring a default and notifying Harbert that Harbert would have ten days to cure the default, the Board proceeded to issue a resolution purporting to terminate Harbert as the contractor for Project 15."
As to Contract 16, Harbert argued that a party "may not terminate or `rescind' a contract unless there has been a material breach of the contract by the other party" and that the Board had no legal right to terminate Contract 16 because, it said, the work under the contract was substantially complete (i.e., no material breach had occurred) at the time the contract was terminated.
The Board opposed Harbert's motion for a partial summary judgment. As to the termination of Contract 15, the Board asserted that Harbert was in breach when the Board terminated Contract 15 because, it said, Harbert had not completed the project on or before the December 1996 completion date, because Harbert had not properly constructed reactor basin #2, and because Harbert had not provided updated schedules for the project as required under the contract. The Board then argued that subsections 8.11 and 8.12 of the standard specifications were "cumulative *1248 and not exclusive of one another. The [Board] may act under either or both provisions without waiving its rights under any other provision of the Contract." The Board stated that subsection 8.12 gave it the right to terminate Contract 15 as it did. As to subsection 8.11, the Board argued that "Harbert's motion for summary judgment is ... due to be denied because there exist facts to support the Board's termination of Harbert pursuant to [subsection] 8.11." The Board contended that Asarisi's November 14, 1997, letter as to Contract 15 constituted notice of default and that that letter, the Board's resolution of December 8, 1997, and Asarisi's letter of December 9, 1997, when taken cumulatively, satisfied the conditions of subsection 8.11 or substantially complied with subsection 8.11.
As to the termination of Contract 16, the Board argued that the plain language of the standard specifications, specifically subsections 5.14, 5.15, and 5.16, rendered the doctrine of substantial performance inapplicable. The Board asserted that it had never "finally accepted" Project 16 because, it said, Harbert never completed all of the work required under Contract 16. The Board also asserted that it terminated Contract 16 because of Harbert's alleged failure to respond to BCM's request that it repair deficient work and complete Project 16 as required under the contract. The Board contended that its termination of the contract was in accordance with subsections 8.11 and 8.12 of the standard specifications.
In January 2004, the trial court entered an order granting Harbert's motion for a partial summary judgment. The trial court's order states that BCM "issued a Certificate of Completion for Contract 16 certifying that Contract 16 was substantially complete as of May 24, 1996"; that BCM authorized Harbert to publish an advertisement of completion for Project 16; and that "[i]n July 1997, nearly a year after BCM certified that Project 16 was substantially complete, the Board claimed to have discovered a number of items of warranty work on Project 16, which the Board claimed were deficient." The trial court noted that "Harbert disputed that [its] work was deficient"; that Harbert "maintained that the work had already been completed"; and that Harbert "disputed that [it] was in default of Contract 16." Thereafter, the trial court noted, the Board declared Harbert in default of Contract 16 and, after providing Harbert with notice and an opportunity to cure, the Board terminated Contract 16.
Based on the foregoing findings, the trial court reasoned, in part:
"The Board's termination of Contract 16 was wrongful because Project 16 was already substantially complete.

"Under the doctrine of substantial performance, an owner may not withhold payment from the contractor once a building contract is substantially complete, whether or not the contractor has strictly complied with all of the terms of the contract. See A.G. Gaston Constr. Co. v. Hicks, 674 So.2d 545 (Ala.Civ.App. 1995) (under the doctrine of substantial performance, literal performance of all contract obligations is not required); see also Bruner v. Hines, [295 Ala. Ill, 115-16,] 324 So.2d 265, 268-69 (Ala.1975) (same); Huffman-East Dev. Corp. v. Summers Elec[.] Supply, [288 Ala. 579, 582-83,] 263 So.2d 677, 680 (Ala.1972) (same); Miles v. Moore, [262 Ala. 441, 444,] 79 So.2d 432, 434-35 (Ala.1955) (same); Wilson v. Williams, [257 Ala. 445,] 59 So.2d 616 (1952); and Alexander v. Smith, [3 Ala.App. 501, 506,] 57 So. 104, 106-07 (1911) (doctrine of substantial performance applied for the first time in Alabama, in a construction context). *1249 As the Supreme Court held in Huffman-East Development [Corp.] v. Summers Electrical Supply, 263 So.2d 677 (Ala.1972):
"`If the work done substantially conforms to the contract, immaterial deviations will not prevent recovery of the contract price, less the amount required to indemnify for injuries sustained by such deviations.'
"[288 Ala. at 582-83, 263 So.2d] at 680."
(Emphasis added.)
The trial court determined that the Board had wrongfully terminated that Contract 15 because the Board "failed to declare a default or provide Harbert with ten-days' notice and opportunity to cure as required by [subsection] 8.11 of the [standard specifications.]" The trial court stated, in part:
"The November 2004 letter, which the Board refers to as a `[subsection] 8.11 notice,' did not provide Harbert with clear, unequivocal notice of the Board's intent to terminate the contract. The letter never uses the word `notice,' and the only reference to [subsection] 8.11 is in the last sentence, which states, `Failure to provide a schedule within ten days will be grounds for finding [Harbert] in default of the Contract in accordance with [subsection] 8.11 of the Specifications.' Rather than providing clear and unequivocal notice of a material breach and opportunity to cure, the November 14, 1997 letter did just the opposite. The reference to the updated schedule was not stated in terms of a breach, but of a requestthat is, `to avoid further delays on this project we request that you provide an updated schedule.' Indeed, by threatening to declare a default if the request was not honored within ten days, the letter left the clear impression that Harbert was not already in default. Thus, as a matter of law, the November 14, 1997 [letter] did not provide the ten days' notice an[d] opportunity to cure required by [subsection] 8.11 of the [standard specifications]...."
"The Board's Resolution terminating Contract 15 and Asarisi's letter of December 9, 1997 were issued in violation of Harbert's contractual right to ten days' notice and the opportunity to cure the alleged default. At the December 8, 1997 Board meeting, BCM recommended that the Board hold Harbert in `default' on [Contract] 15 for failure to provide an updated schedule. The Board then voted to accept BCM's recommendation to place Harbert in default. At that point, the Board should have provided Harbert with written notice of the finding of default and a ten-day opportunity to cure. Instead, the Board adopted an undated Resolution that purported not to declare a default under Contract 15, but to terminate Harbert's contract. Thus, the Board proceeded to terminate Contract 15 without giving Harbert the required ten days' notice of the alleged default and the opportunity to cure.

"[Subsection] 8.11 is part of documentation used by the Board in all of its construction contracts. It was drafted by the Board and was not subject to negotiation. In addition, the procedures used with respect to the termination of Contract 16 show that the Board was well aware of and understood the notice requirements.... These same procedural requirements were applicable to Contract 15, but were not followed.
"The November 14, 1997 letter is unambiguous and plainly did not provide clear and unequivocal notice of the Board's intent to terminate Contract 15. Even if the letter were ambiguous, however, summary judgment would be appropriate. *1250 Because a notice of default and the opportunity to cure must be clear and unequivocal, an ambiguous notice is insufficient as a matter of law....
"Because the board did not provide the notice required by [subsection] 8.11, Harbert is entitled to partial summary judgment determining that the Board's termination of Contract 15 was wrongful.
"... [T]he Board's termination of Contract 15 was wrongful because the Board failed to provide Harbert with ten days' notice and opportunity to cure the alleged default in accordance with [subsection] 8.11 of the [Standard specifications]."
(Emphasis added.)
Having obtained a favorable ruling as to the Board's wrongful termination of Contract 15 and Contract 16, in December 2004 Harbert and Federal filed a joint motion for a summary judgment against the Board on its "Counterclaim against Harbert and Third-Party Complaint against Federal." In part, Harbert and Federal argued:
"[T]he Board's wrongful termination of Harbert as the contractor on Contracts 15 and 16 resulted in a breach of the contracts by the Board that bars the Board from recovering its affirmative claim for damages against Harbert. The Board's Counterclaim against Harbert is, therefore, due to be dismissed.
"... The wrongful termination of Harbert as the contractor for the Projects also discharged Federal's obligations to the Board under the Bonds. As a matter of law, a bond claimant that does not have a right of recovery against the principal does not have a right of recovery against the surety."
In January 2005, the Board filed a motion and brief in opposition to Harbert and Federal's joint motion for a summary judgment, and it requested that the trial court reconsider its January 2004 order as to the wrongful termination of Contract 15 and Contract 16. In addition to the arguments the Board made in response to Harbert's motion for a partial summary judgment, as to Contract 15 the Board argued that letters written before Asarisi's November 14, 1997, letter had demanded that Harbert correct the deficiencies as to reactor basin # 2 and that those pre-November 14, 1997, letters constituted the notice and opportunity to cure required by subsection 8.11. The Board also argued that Harbert's repeated failures to adequately respond to the Board's demands constituted an "anticipatory breach and repudiation of Contract 15 so as to excuse the Board from providing such notice." In support of its anticipatory-repudiation argument, the Board cited Congress Life Insurance Co. v. Barstow, 799 So.2d 931, 934 (Ala.2001), and Solitron Devices, Inc. v. Honeywell, Inc., 842 F.2d 274, 278 (11th Cir.1988). Further, the Board argued that, "[a]t the very least, a genuine issue of material fact exist[s] as to whether Harbert was provided a sufficient cure notice to meet the contractual requirements of [subsection] 8.11."
As to Contract 16, the Board argued that the trial court should have denied the summary-judgment motion as to the Board's breach-of-contract claim because, it said, a valid "notice-and-opportunity-to-cure letter" was provided to Harbert and because, it said, Harbert failed to correct deficiencies in its work that appeared during the one-year warranty period described in subsection 5.16 of the standard specifications.
On January 14, 2005, the trial court conducted a hearing on Harbert and Federal's joint motion for a summary judgment. Apparently, at the conclusion of the hearing, *1251 the trial court requested that the parties provide it with proposed orders and "any other information that might be helpful."
On January 31, 2005, the Board filed (1) a supplemental letter brief urging the trial court to deny Harbert and Federal's joint motion for a summary judgment, (2) proposed orders for the trial court denying Harbert and Federal's motion, (3) a motion requesting that the trial court allow the Board to amend its counterclaim against Harbert and its third-party complaint against Federal, and (4) a proposed "Fourth Amended Counter-Claim and Third-Party Complaint."[18] The proposed orders included an order denying Harbert and Federal's joint motion for a summary judgment, "the order urged by the Board," and an alternative order "that would find that no sufficient cure letter was sent as to Contract 15 and that Contract 16 was substantially completed, but would retain the breach of warranty [subsection 5.16] and fraud counts as viable claims."
In February 2005, the Board filed a letter with the trial court "to provide a limited response" to Harbert's most recent submission. The Board's letter states, in part:
"Harbert did not even challenge the Board's position that there are valid breach of warranty claims for both Contract 15 and 16. ... Harbert also knows that it made multiple false statement[s] of its degree of completeness and is liable for such misrepresentations. Harbert obviously hopes its ill founded argument as to `inadequate cure notice' will be blithely accepted as to these other countsboth as to warranty and fraud. For these and many other reasons, Harbert's motion for partial summary judgment is due to be denied."
On March 16, 2005, the trial court entered a summary judgment ("the March 2005 judgment") incorporating the findings of fact and conclusions of law from its January 2004 order. The March 2005 judgment also states:
"2. In its Counterclaim ... the Board seeks damages for the costs the Board allegedly incurred in completing certain construction projects after terminating Harbert as the general contractor.
"3. The damages sought by the Board in each of the counts (contract and tort) are the same: (1) the costs the Board allegedly incurred in completing the work (consisting of completion work and the correction of alleged deficiencies) after Harbert exited the job site; and (2) other consequential damages that the Board allegedly suffered as a result of Harbert's failure to complete the work on the projects.
"4. The Board seeks damages against Harbert, as the general contractor, and against Federal, as surety, under the performance bonds that Federal issued to secure Harbert's obligations to the Board on the construction contracts.
"5. The Board has not come forward with any evidence of any other kind of alleged damages.
"....
"B. The termination of Harbert's contracts was wrongful, for the reasons set for in the Court's Memorandum Opinion and Order of January 22, 2004, and effectively prevented Harbert from completing the work on the projects.

*1252 "C. The Board's wrongful termination of Harbert's contracts constitutes a material breach of the contracts that excuses Harbert's future performance, and bars the Board's Counterclaim for completion costs. Federal Ins. Co. v. I. Kruger, Inc., 829 So.2d 732 (Ala.2002) (where contractor prevented subcontractor from performing under subcontract, subcontractor was excused from performance); see also Shirley v. Lin, 548 So.2d 1329, 1334 (Ala.1989) (`Once a party to a contract repudiates the agreement, the other party is excused from further performance.'); Health Care Mgmt. Corp. v. Rubenstein, 540 So.2d 77, 78 (Ala.Civ.App.1989) (`Because of the defendant's material breach of the contract, the plaintiff's future performance of the contract was excused and the plaintiff had an immediate cause of action for that breach.'); Ex parte A.B./Wildwood Ltd. P'ship, 793 So.2d 784, 790 (Ala.2000) (Lyons, J., concurring in the result) (`Once a party has committed an anticipatory breach, the other party is excused from further performance.').
"D. The discharge of Harbert's obligations under the contracts discharged Federal's obligations to the Board under the performance bonds. ...
"E. There is no just reason to delay entry of a final judgment on the Board's Counterclaim and Third Party Complaint. This order disposes of all of the Board's claims against Harbert and Federal...."
The trial court certified its judgment as a final judgment, after which the Board filed a timely notice of appeal to this Court.

II. Preliminary Matters

A. Claims at Issue
By its terms, the March 2005 judgment disposed of all the Board's claims against Harbert and Federal. The claims that were before the trial court when it entered the March 2005 judgment were the claims described in the Board's March 2002 amended and restated counterclaim and third-party complaint, see note 16, supra. In that regard, the claims at issue in this appeal are the Board's claims alleging breach of contract as to Contract 15 and Contract 16 (including, but not limited to, breach of the one-year warranty described in subsection 5.16 of the standard specifications as to each contract) and the claims alleging fraud as to each project.[19]

B. Preliminary Matters as to BCM
Before addressing the Board's arguments, we must note that BCM, through its successor corporation ATC Group Services, Inc., has filed an appellate brief in which it denominates itself as an appellee. In its brief, however, BCM adopts and *1253 incorporates the Board's arguments, and makes additional arguments, in support of reversal of the March 2005 judgment. Clearly, the March 2005 judgment is not a judgment in favor of BCM, and BCM cannot be properly designated as an appellee. Likewise, the March 2005 judgment was not a judgment against BCM; that judgment adjudicated the Board's claims against Harbert and Federal. Even if this Court were to assume that BCM had some interest as to the Board's claims that might support an appeal, BCM did not file a separate notice of appeal as to the March 2005 judgment, and it did not join the Board's notice of appeal. See Rule 3(b), Ala. R.App. P.
BCM has not appealed, and it is not an appellee in the Board's appeal. Thus, we have not considered BCM's appellate brief and the arguments contained in that brief for purposes of our decision in the present case.

III. Standard of Review
We review a summary judgment de novo and apply the same standard that the trial court applied. McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992). As this Court stated in Capital Alliance Insurance Co. v. Thorough-Clean, Inc., 639 So.2d 1349 (Ala.1994):
"A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present `substantial evidence' creating a genuine issue of material fact`evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)."
639 So.2d at 1350.

IV. Analysis

A. The Board's Fraud Counterclaim
As to the Board's fraud claims, in its appellate brief the Board argues, in part:
"The [March 2005] Order's stated grounds for granting summary judgment, i.e., that Harbert was wrongfully terminated, even if true, (which is disputed), would not be a defense to the Board's fraud claims. ... As such, the Trial Court erred in dismissing the Board's claims of fraud under the correct standard of review."
In support of its argument, the Board quotes a statement from Cooley v. Gulf Bank, Inc., 773 So.2d 1039, 1043 (Ala.Civ. App.1999), listing the elements of a fraud claim, and cites pages in three other cases where those elements are also listed, namely Brushwitz v. Ezell, 757 So.2d 423, 429 (Ala.2000); Foremost Insurance Co. v. Parham, 693 So.2d 409, 422 (Ala.1997); and Carter v. Liberty National Life Insurance Co., 849 So.2d 977, 981 (Ala.Civ.App. 2002). The trial court implicitly found, however, that the manner in which the Board terminated Contract 15 and Contract 16 constituted a breach of those contracts and that this breach defeated the *1254 Board's fraud claims. The Board cites no authority in its brief to this Court for its contrary position that the viability of a plaintiff's claim alleging fraudulent misrepresentations or suppression relating to a contract does not depend on its performance of its obligations under that contract.
It is the appellant's burden to refer this Court to legal authority that supports its argument. Rule 28(a)(10), Ala. R.App. P., requires that the argument in an appellant's brief include "citations to the cases, statutes, [and] other authorities ... relied on." Consistent with Rule 28, "[w]e have stated that it is not the function of this court to do a party's legal research." Spradlin v. Spradlin, 601 So.2d 76, 78 (Ala.1992) (citing Henderson v. Alabama A & M University, 483 So.2d 392, 392 (Ala. 1986) ("`Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor function to perform all the legal research for an appellant.' Gibson v. Nix, 460 So.2d 1346, 1347 (Ala. Civ.App.1984).")). Because the Board has cited no legal authority that addresses whether a party's failure to perform its contractual obligations defeats its fraud claims relating to those contracts, we will not consider whether the trial court's judgment should be reversed as to this issue.

B. The Board's Claim of Breach of Contract as to Contract 16
To paraphrase the trial court's January 2004 order and its March 2005 judgment, the trial court concluded:
1. There was no issue but that Harbert had substantially completed Project 16 on May 24, 1996.
2. As a matter of law, after it had substantially performed its obligations, Harbert was entitled to the balance of the contract price under Contract 16, less the costs, if any, of correcting any minor deviations that existed as of that date.
3. The Board's termination of Contract 16 after Project 16 was substantially complete was a material breach of Contract 16.
4. The Board's wrongful termination of Contract 16 prevented Harbert from fulfilling its remaining contract obligations, i.e., correcting any defective work or unperformed work that it had been paid for and that existed as of May 24, 1996, and performing its one-year-warranty obligation, at its own expense.
5. As a matter of law, the Board's wrongful termination of Contract 16 excused Harbert's future performance and barred the Board's counterclaim seeking completion costs ("consisting of completion work and the correction of alleged deficiencies") and consequential damages under the contract.
The Board argues that, based on the terms of Contract 16, it was not precluded from terminating Harbert's continued performance under the contract simply because Harbert might have substantially performed its obligations. The Board argues that, even if Harbert had substantially performed (and therefore was entitled to certain payments under the contract), it continued to have ongoing obligations under the contract, including obligations to correct "punch-list" items and to perform any work which became necessary under the one-year warranty. If Harbert failed to perform some or all of these obligations, the default and termination provisions of the contract apply just as they do to defaults during the substantial-performance phase of the contract work. We agree.
We note that subsection 5.09 of the standard specifications required Harbert to correct "unacceptable" work, i.e., "punch-list" items, discovered before "final acceptance." *1255 Also, subsection 5.10 of the standard specifications states:
"All work which has been rejected shall be remedied or else removed and replaced in an acceptable manner by [Harbert] at [its] own expense, and no compensation shall be allowed him for such removal or replacement. ... Upon failure on the part of [Harbert] to immediately comply with any order of [BCM] made under the provision of this Section [5], [the Board] shall have authority to cause defective work to be remedied, or removed and replaced ... and to deduct the cost from any monies due or to become due [Harbert]. In case no such monies are available, the amount shall be charged against [Federal]."
Likewise, subsection 8.13 of the standard specifications, which discusses Harbert's submission of payment estimates for work it had performed, states: "To insure the proper performance of this Contract, the [Board] will retain 10 percent of the amount of each estimate ... until final completion and acceptance of all Work covered by this Contract." (Emphasis added.)
As noted in the factual background discussion above, the standard specifications further state:
"5.15 FINAL ACCEPTANCE:

"After the Final Inspection is made as outlined above, [Harbert] shall maintain the Work for 30 days in the same manner as set forth under [subsection 4.08] `Maintenance of the Work During Construction.' The Work will be finally accepted at the end of the 30 day maintenance period provided all work has been satisfactorily maintained.

"[Harbert], immediately after receiving the letter of Final Inspection, shall give notice of said completion of Work by an advertisement in some newspaper of general circulation published within the city or county wherein the Work has been done for a period of four successive weeks. ...
"In no instance shall a final settlement be made upon [Harbert] until the expiration of the Maintenance Period and until the Contract is completed and Project accepted by the [Board].

"5.16 MAINTENANCE GUARANTEE AFTER ACCEPTANCE:

"Neither the final certificate of payment nor any provisions in the Contract nor partial or entire use or occupancy of the premises by the [Board] shall constitute an acceptance of work not done in accordance with the Contract or relieve [Harbert] of liability in respect to any express warranties or responsibility for faulty materials or workmanship. [Harbert] shall remedy any defects in the Work and pay for any damage to other work resulting therefrom which shall appear within a period of one year from the date of final acceptance of the Work unless a longer period is specified. The [Board] will give notice of observed defects with reasonable promptness and [Harbert] shall repair the defects immediately. [Harbert's] Performance or Contract Bond shall remain in effect and cover this guarantee. After completion of the Project and prior to final acceptance, [Harbert] shall provide a statement addressed to the [Board] from [Federal] acknowledging that the Contract Bonds will remain in effect during the one-year warranty period. Final payment under the Contract will not be made until this statement is received."
(Emphasis added.) Thus Harbert clearly had an ongoing obligation to complete the punch-list items in an acceptable manner and to correct deficient work discovered "within a period of one year from the date of final acceptance."
*1256 Further, we have found no contractual support for a conclusion that the Board's right to terminate Contract 16 pursuant to subsections 8.11 and 8.12 of the standard specifications rested on whether Harbert's alleged "delay, neglect, or default" arose before substantial completion of the work to be done under the contract. Subsection 8.11 clearly states, without qualification, that Harbert would be in potential default if it "neglect[ed] or refuse[d] to remove materials or perform anew such work as shall be rejected as defective and unsuitable, or discontinue[d] prosecution of the Work, or from any other cause whatsoever [did] not carry the Work in an acceptable manner." (Emphasis added.) Subsection 8.12 authorized the Board to "summarily terminate" the contract "[i]n the event of failure by [Harbert] to perform any and all of [its] obligations in a prompt and efficient manner satisfactory to the [Board.]" (Emphasis added.)[20] There is no contractual basis for the conclusion that the Board's right to terminate Contract 16 was limited to "delay[s], neglect[s], or default[s]" that occurred before Harbert had substantially performed the construction of Project 16.
The evidentiary materials presented to the trial court do not support the conclusion that there was no genuine issue of fact as to whether Harbert completed the punch-list items in an acceptable manner or adequately performed any necessary warranty work. Viewing the parties' submissions in the light most favorable to the Board, and drawing all reasonable factual inferences in favor of the Board, see Capital Alliance Insurance, supra, based on the evidentiary materials submitted to the trial court discussed above and those discussed hereinafter, we conclude that genuine issues of material fact existed with respect to alleged deficiencies in Harbert's work, both as it existed as of May 24, 1996, and as subsequently performed.
Our conclusion is supported by the correspondence reported above. In addition, the Board submitted to the trial court an affidavit from Donald Lynn May, a registered electrical engineer who had worked on Project 16, that states, in part:
"Subsequent to June 14, 1996, I inspected the physical plant and work comprising the scope of Contract 16. I compared the actual progress made by Harbert to the contract documents for Contract 16, including the plans and specifications. Harbert's performance of the work of Contract 16 was unacceptable in that Harbert did not complete substantial portions of the work specified by the contract. These portions include, but are not limited to: incomplete wiring for instrument loops; instrument devices missing; incomplete programming; failure to tag and identify wires; absence of any interlocks and missing or inadequate displays of the process within the control room.
"In my opinion as an engineer involved in Contract 16, Harbert's performance was unsatisfactory. The work performed did not constitute acceptable compliance with the work specified by Contract 16."
Also, the Board submitted the following testimony from Asarisi:
"Q. And what problem with the centrifuge was reported to Harbert in that letter of April 2, 1997?
"A. This states that the required analog output to control the speed of the drives, the feed pumps, and control of the polymer pump is not provided and, also there are no analog inputs to accept *1257 sludge flow signals or tank levels and, also the lightning protection system had not been installed and performance testing had not been done.
"Q. Were those items that were essential to proper fulfillment of the Contract 16?
"[Harbert's counsel]: Object to the form.
"A. Yes, sir.
"Q. In your judgment as engineer, could Contract 16 be acceptably fulfilled in the absence of those items being properly accomplished?
"[Harbert's counsel]: Object to the form.
"A. No, sir."
(Emphasis added.) As to the June 18, 1997, punch list, Asarisi further stated:
"Q. What items did the engineer determine were left out of the contract and not installed by Harbert?
"[Harbert's counsel]: Object to the form.
"....
"A. I remember there was a control panel issue, which was in one of these prior exhibits that wethe controls, the control panel, specific controls were missing from that. That was a major item, sir.
"Q. When you speak of items being left out, do you mean that if you looked in the control panel box, it simply was not there?
"A. That's correct, sir."
(Emphasis added.) We further note that the Board presented evidentiary materials indicating that the two centrifuges Harbert installed ultimately proved so deficient as to require the addition of a new, third centrifuge to bring Project 16 up to the capacity required under Contract 16.
Based on the foregoing, we conclude that the trial court erred when it entered a summary judgment against the Board as to its claims against Harbert alleging a breach of Contract 16 and as to its claims against Federal under the surety bond for Contract 16, on the stated ground that the Board's termination of Contract 16 in December 1997 came after Harbert had rendered substantial performance. The provisions of Contract 16 gave the Board the right to such a termination if justified by Harbert's acts or omissions. A genuine issue of fact exists as to whether Harbert's acts or omissions justified the Board's termination of Contract 16.

C. The Board's Claims of Breach of Contract as to Contract 15
In its January 2004 order, the trial court concluded that subsection 8.11 of the standard specifications required the Board to provide Harbert with notice and an opportunity to cure before it terminated Contract 15; that the Board failed to satisfy the terms of subsection 8.11 and the requirements of applicable law; and that the Board's termination of Contract 15 was therefore wrongful. In the March 2005 judgment, the trial court concluded that its wrongful termination of Contract 15 prevented the Board from recovering on its breach-of-contract claim against Harbert and the related bond claim against Federal.[21] The Board does not argue on appeal *1258 that subsection 8.12 of the standard specifications allowed it to terminate Contract 15 in the manner that it did. Instead, the Board relies on the following arguments as to alleged error by the trial court.

1. Anticipatory Repudiation
Harbert and Federal do not dispute that the Board would be relieved of any obligation to comply with subsection 8.11 if Harbert in fact repudiated Contract 15. See Shirley v. Lin, 548 So.2d 1329, 1334 (Ala.1989) ("Once a party to a contract repudiates the agreement, the other party is excused from further performance."). The Board argues that there was a genuine issue of material fact as to whether Harbert's conduct "constituted an anticipatory breach and repudiation of Contract 15 so as to excuse the Board from providing ... notice" and an opportunity to cure under subsection 8.11 of the standard specifications. Specifically, the Board argues that "Harbert's anticipatory breach and repudiation took place in July and August 1997."
As this Court stated in Shirley:
"The following rules concerning anticipatory breach, or repudiation[,] of a contract have been recognized in Alabama:
"`To amount to a renunciation, ... the evidence must show words or acts evincing an intention to refuse performance within the future time allowed by the contract.
"`... "Merely because a given act or course of conduct of one party to a contract is inconsistent with the contract is not sufficient; it must be inconsistent with the intention to be ... bound by it."
"`....
"`"Repudiation, among other things, means rejection, disclaimer, renunciation, or even abandonment."
"`Some authorities state that the repudiation by one party "must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his obligation."'
"Draughon's Business College v. Battles, 35 Ala.App. 587, 590, 50 So.2d 788, 790 (1951) ... (citations omitted)."
548 So.2d at 1334 (emphasis omitted.) This Court has also stated:
"`A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of his obligations under the contract.' E. Allan Farnsworth, Contracts, § 8.21, at 633-34 (1982). If a party `wrongfully states that he will not perform unless the other party consents to a modification of the contract, the statement is a repudiation.' Id. at 635, § 8.21. As a general rule, `an anticipatory repudiation gives the injured party an immediate claim to damages for total breach, in addition to discharging his remaining duties of performance.' Id. at 630, § 8.20."
*1259 Congress Life Ins. Co. v. Barstow, 799 So.2d 931, 938 (Ala.2001).
In support of its argument, the Board directs our attention to Harbert's July 14, 1997, letter to Asarisi, Harbert's August 18, 1997, letter to Asarisi, and Harbert's September 17, 1997, letter to Asarisi. As discussed earlier in this opinion, Harbert sent the July 14, 1997, letter purportedly after it had repeatedly attempted to repair the Combiflex system in accordance with the contract specifications. The letter stated:
"It is [Harbert's] position, at this point in time, that we have thoroughly exhausted all required means and methods in performing this repair work in accordance to the contract documents and as directed by ... BCM. As of July 11, 1997, we have ceased repair operations until further notice. We are hereby requesting that ... BCM now provide an alternative repair method that will resolve this situation. It is imperative that we receive your response and direction no later than July 17, 1997 to prevent further delay to the start-up of Reactor No. 2 and the timely completion of this project.

"....
"If you have any questions or require additional information regarding this matter, please feel free to contract this office. We look forward to receiving your direction in completing these repairs to the mutual satisfaction of all parties concerned."
(Emphasis added.) The emphasized language clearly reflects that Harbert remained willing and able to make repairs to reactor basin #2 but that it believed it had complied with BCM's previous repair requests to no avail. We also note that the August 14, 1997, letter that Asarisi sent Harbert contains no indication that the Board had interpreted Harbert's July 14, 1997, letter as a repudiation of its obligations. Asarisi's August 14, 1997, letter stated, in part:
"... Our daily records indicated that your present work force consists of 1 superintendent and 3 laborers. We are aware of your efforts to seal Reactor 2. However, there are still a number of items that would keep the project from starting up if Reactor 2 was ready today. We have enclosed a partial list of items that have to be completed before Reactor 2 is put on line. This is not a complete list and there may be other incomplete items that delay start up.
"We are quite concerned about the slow rate of progress on the project and the impact that delays have on the [Board] and the operation of the plant. Therefore, in accordance with [subsection] 8.11 of the Contract Specifications you are hereby notified that you have 10 days to start work on each of the items on the enclosed list, with the exception of items that are dependent on the completion of Reactor 2. If work has not begun on all noted items within 10 days the [Board] will notify [Federal] that the project is in default. We trust that you will provide an adequate work force to complete the work within the specified time and to avoid further actions against you."
(Emphasis added.) Based on the foregoing, the July 14, 1997, letter would not support a finding that Harbert had repudiated its obligations under Contract 15.
As to the Board's reliance on the August 18, 1997, letter from Harbert to Asarisi, that letter was written after Harbert had obtained an expert opinion as to the unsuitability of the Combiflex system for reactor basin # 2. The letter stated, in part:
"Based on the results of the inspection and Mr. Shutz's assessment thereof, it is the position of ... Harbert ... that ... BCM will now have to select an appropriate *1260 alternative method [to seal reactor basin # 2].
"We trust that ... BCM will provide the appropriate repair method accordingly to minimize any further delays that have occurred to the project as a result of this matter. For the record, all work on Reactor No. 2 ceased August 13, 1997. We look forward to receiving a positive response from ... BCM no later than August 22, 1997."
After Harbert sent the August 18, 1997, letter, it and Asarisi continued to dispute the appropriate repair method for reactor basin #2, and, as reflected in Harbert's September 17, 1997, letter to Asarisi and Steeves, Harbert proposed a repair method different from the repair method proposed by the Board and Asarisi.[22] Harbert closed the September 17, 1997, letter by arguing that the failure at issue was due to the choice of an "improperly suited product," by warning the Board not to attempt to "cover-up the problem" by turning again to Sika and its product, and by stating: "It is our steadfast position that we certainly cannot and will not acquiesce to the proposed method and approach by the [Board] in dealing with this problem." Thereafter, the parties correspondence reflects that Harbert continued to insist that the Board allow it to attempt its alternative sealant system while the Board proceeded with its proposed repair test, namely to have a Sika-certified installer reinstall the Combiflex system in a "test cell" of reactor basin # 2, and, if the system was successful in the test cell, to have the Combiflex system properly reinstalled in the remaining portions of reactor basin # 2.
The foregoing correspondence reflects a sharp dispute between the parties as to the Board's "method and approach in dealing with this problem" (emphasis added), i.e., the Board's attempt to confirm that the Combiflex system was suitable for reactor basin # 2 and, if so, to reinstall the system throughout the reactor basin. The correspondence does not reflect a refusal by Harbert to obey a directive from the Board or its agent, BCM, for Harbert to perform the repairs using the Combiflex system, or for Harbert to arrange and pay for a particular subcontractor to do so.
The foregoing letters did not constitute substantial evidence that Harbert manifested an intent not to be bound by Contract 15, that Harbert abandoned the work on Project 15, or that Harbert exhibited an "an unqualified refusal, or declaration of inability, substantially to perform according to the terms of [its] obligation" under Contract 15 as to the sealing of reactor basin #2. Shirley, 548 So.2d at 1334. Likewise, the letters did not constitute *1261 substantial evidence that Harbert "`wrongfully state[d] that [it] [would] not perform unless [the Board] consent[ed] to a modification of the contract.'" Harbert simply continued to insist that the Board was making a mistake by proceeding with an independent party to test-repair the reactor basin using the Combiflex system rather than adopting Harbert's proposed alternative repair method.
Based on the foregoing, we cannot conclude that the trial court erred by rejecting the Board's anticipatory-repudiation argument as to Contract 15.

2. Failure to Complete Contract 15 by the Deadline for Performance
In a brief argument inserted in the midst of the Board's discussion of anticipatory repudiation, the Board states:
"Also, where termination is for failure to meet a performance deadline, the law eliminates the notice requirement. Abcon Assoc., Inc. v. United States, 44 Fed.Cl. 625, 631 ([ ]1999). Harbert admittedly did not meet the December 29, 1996, contract completion date. In fact, as of the date of termination, December 8, 1997, Harbert's time for performance of Contract 15 had expired by 346 days. On July 14, 1997, Harbert gave the Board notice that it had `ceased' or discontinued Reactor Basin 2 work on July 11, 1997. Then, just so there would be no doubt, on August 18, 1997, Harbert again stated 'For the record, all work on Reactor No. 2 ceased August 13, 1997.' By its words and actions, Harbert manifested a clear intent not to complete Contract 15. It abandoned the work and refused demands to finish."
Harbert and Federal have not responded to the Board's argument that Harbert's failure to timely complete Project 15 eliminated any requirement that the Board provide Harbert with notice under subsection 8.11, nor have Harbert and Federal discussed the pertinence of Abcon Associates, Inc. v. United States, 44 Fed.Cl. 625 (1999). However, after reviewing Abcon, we are not convinced by the Board's ephemeral, conclusory argument, even if Abcon correctly reflects the law in Alabama, an issue we do not decide. In Abcon, the Court of Federal Claims concluded, based on the language of the contract at issue there and a pertinent federal regulation governing contracts with the United States Postal Service, that in order "[t]o terminate for a failure to make progress, an agency must provide a ten-day cure notice under the terms of the contract, whereas a termination for failure to meet deadlines requires no such notice." 44 Fed.Cl. at 631. The federal regulation discussed in Abcon is not pertinent to the present case, and the Board has directed us to no part of Contract 15, including the standard specifications, that relieved it of its obligation to comply with subsection 8.11 when termination of the contract was based on Harbert's failure to complete the project by the scheduled completion date.
It is the appellant's burden to refer this Court to the "parts of the record relied on" in support of its argument for reversal. Rule 28(a)(10), Ala. R.App. P. "This Court does not have the obligation to search the record for substantiation of unsupported factual matter appearing in an appellant's brief in order to determine whether a judgment should be reversed." Friedman v. Friedman, 971 So.2d 23, 31 (Ala.2007). Also, as noted above, "it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994); see also Rule 28(a)(10), Ala. R.App. P.
*1262 Based on the Board's failure to adequately develop its argument that it had an no obligation to provide Harbert with notice of default because Harbert did not complete the project by the scheduled completion date for Contract 15, we will not further address that argument, nor will we reverse the trial court's judgment based on that argument.

3. Compliance with Subsection 8.11[23]
The Board argues that it complied with the notice and cure provision of subsection 8.11. Generally, "[a] clear and unambiguous notice, timely given, and in the form prescribed by the contract, is essential to the exercise of an option to terminate the contract." 17B C.J.S. Contracts § 446 (1999).[24]
Except as previously discussed with respect to the issue of anticipatory repudiation, the Board does not argue that it did not have to strictly comply with subsection 8.11 nor does it argue that the failure to comply with subsection 8.11 would not be a material breach of Contract 15 that would support the rejection of its breach-of-contract claim. Instead, the Board argues that the trial court erred when it found that Asarisi's November 14, 1997, letter did not provide clear and unambiguous notice under subsection 8.11. Further, the Board contends that in addition to Asarisi's November 14, 1997, letter, the Board "sent Harbert many [subsection] 8.11 notices demanding Harbert cure its mal-performance and under-performance, including notices of May 7, 1997; August 14, 1997; [and] August 27, 1997."[25]
We again note that subsection 8.11 of the standard specifications states:
"If the Contractor ... fails to perform the work with sufficient workmen, equipment *1263 or materials to insure its prompt completion, or performs the Work unsuitably, or neglects or refuses to remove materials or perform anew such work as shall be rejected as defective and unsuitable, or discontinues prosecution of the Work, or from any other cause whatsoever does not carry the Work in an acceptable manner, ... the [Board] or [its] representative may give notice in writing by registered mail to the Contractor and the Surety of such delay, neglect, or default. If within 10 days after such notice the Contractor does not proceed to remedy to the satisfaction of the [Board] the fault specified in said notice, or the Surety does not proceed to take over the Work for completion, the [Board] shall have full power and authority, without impairing the obligation of the Contract or the Contract Bonds, to take over the completion of the Work; ... to enter into agreements with others for the completion of the Contract according to the terms and provisions thereof; or to use such other methods as in its opinion may be required for the completion of the Contract. The Contractor and his Surety shall be liable for all costs and expenses incurred by the [Board] in completing the Work, and also for the liquidated damages in conformity with the terms of the Contract."
As the trial court construed it, subsection 8.11 required that the Board provide Harbert with written notice of any "delay, neglect, or default" in its performance, and we adhere to that conclusion, given the arguments presented by the Board.[26] As a preliminary matter, we note that subsection 8.11 simply provided Harbert with 10 days "to remedy to the satisfaction of the [Board] the fault specified in said notice"; it does not provide that Harbert's mere attempt to remedy any fault at issue would preclude termination of the contract when its performance had already been deficient. Likewise, subsection 8.11 warns Federal that upon its receipt of notice of such "delay, neglect, or default" from the Board it would have 10 days to "proceed to take over the Work for completion"; it does not provide that Federal had the right to wait to see whether Harbert cured the "delay, neglect, or default" in its performance. We further note that the Board's undated resolution reporting its actions taken on December 8, 1997, constitutes substantial, though not conclusive, evidence that the Board terminated Contract 15, not only because of the deficiencies discussed in Asarisi's November 14, 1997, letter to Harbert, but also because "the Board ha[d] allowed Harbert in excess of ten days from the date of default notice to remedy the deficiencies documented by various letters and multiple meetings between the parties to the project." With these matters in mind, we turn our attention to the letters the Board argues satisfied the notice and cure provision of subsection 8.11.
The Board argues that Asarisi's letters to Harbert dated May 7, 1997, August 14, *1264 1997, August 27, 1997, and November 14, 1997, satisfied the requirements of subsection 8.11, i.e., that each letter provided Harbert with notice of "delay, neglect, or default" that Harbert failed to cure within 10 days and as to which Federal failed to take over the Work within 10 days. We will address the letters in chronological order. The May 7, 1997, letter from Asarisi to Harbert states:
"Reactor Number 2 was pressure tested on May 1, 1997. The pressure test failed. The interior seal system is designed to withstand design pressures. The exterior seal is not a pressure system and is intended to keep water and other contaminates away from the interior seal. Therefore, leak repairs must be made on the interior of the reactor and not the exterior. We trust that these repairs will be made immediately to avoid further delays on the project.

"Please let us know if you have any questions."
(Emphasis added.) The Board argues that the May 7, 1997, letter, and particularly the portion emphasized above, constituted substantial evidence of "written notice to Harbert that its work was rejected as `defective and unsuitable' and specifically identified one of three reasons for termination allowed by [subsection] 8.11, i.e., `delay.'" The Board then argues that there was substantial evidence that Harbert failed to correct its allegedly defective work on reactor basin # 2 within the "cure period" established by the May 7, 1997, "notice."
Aside from the fact that the May 7, 1997, letter did not notify Harbert of the need to make the necessary repairs within the 10-day period contemplated by subsection 8.11, that letter was not sent "by registered mail," and it was not sent to Federal. Thus, we cannot conclude that the trial court erred by not treating the May 7, 1997, letter as a notice given pursuant to subsection 8.11.
The August 14, 1997, letter from Asarisi to Harbert states:
"As you are aware, [Harbert] informed the [Board] and BCM in November 1996 that the new Reactor and Clarifiers would be on line by December 26, 1996 and the project would be complete by March 1997. To date, none of this has happened. Our daily records indicate that your present work force consists of 1 superintendent and 3 laborers. We are aware of your efforts to seal Reactor 2. However, there are still a number of items that would keep the project from starting up if Reactor 2 was ready today. We have enclosed a partial list of items that have to be completed before Reactor 2 is put on line. This is not a complete list and there may be other incomplete items that delay start up.
"We are quite concerned about the slow rate of progress on the project and the impact that delays have on the [Board] and the operation of the plant. Therefore, in accordance with [subsection] 8.11 of the [Standard] Specifications you are hereby notified that you have 10 days to start work on each of the items on the enclosed list, with the exception of items that are dependent on the completion of Reactor 2. If work has not begun on all noted items within 10 days the [Board] will notify [Federal] that the project is in default. We trust that you will provide an adequate work force to complete the work within the specified time and to avoid further actions against you.

"Should you have any questions, please call."
The Board argues that Harbert's "uncorrected insufficient work force was yet another ground per [subsection] 8.11 for the Board's takeover of the Work. ... Contrary to the [trial court's] findings, this *1265 letter clearly referenced and provided Harbert with a [subsection] 8.11 notice and opportunity to cure its deficiencies in the work of Contract 15."[27] We note that the August 14, 1997, letter was sent to Harbert and Federal by certified mail. Also, it clearly notified Harbert of its alleged "delay, neglect, or default." The letter then specified the response the Board required of Harbert; that response was not that Harbert perform all the unperformed work within 10 days, but that it "start work on each of the items on the enclosed list, with the exception of items that are dependent on the completion of Reactor 2" within 10 days. The letter continued: "If work has not begun on all noted items within 10 days the [Board] will notify [Federal] that the project is in default." Thus, the August 14, 1997, letter required only that Harbert begin work on all the noted items, not that it complete the work, within 10 days. The Board did not produce substantial evidence that Harbert failed to begin work on the specified items within 10 days, though, as hereafter discussed, there is evidence indicating that it did not complete the items. Likewise, we note that the August 14, 1997, letter informed Federal that the Board would notify Federal that Harbert was "in default" if Harbert had "not begun [work] on all noted items within 10 days." The Board produced no evidence indicating that it sent Federal such a notice. Thus, we cannot conclude that the trial court erred by not treating the August 14, 1997, letter as a notice given pursuant to subsection 8.11.
The August 27, 1997, letter from Asarisi to Harbert states:
"As you know, we sent a letter on August 21, 1997, to Mr. Enrico Tissi, the President of [Sika], which included a copy of your consultants report on the Combiflex system inside Reactor 2. We were notified yesterday that Buddy Bonine, from [Sika], will be at the [treatment plant] on Tuesday, September 2, 1997, to inspect the installation and provide their opinion. As Malcolm [Steeves] has previously indicated, we will provide [Harbert] an alternative system to seal the Reactor if [Sika] agrees that the Combiflex system is not suitable for the application.
"We welcome and encourage you to be present during [Sika's] visit on September 2.
"If you have any questions, please let us know."
The Board argues that this letter "directed Harbert to seal Reactor basin 2" and that "Harbert again refused to do the work as called for by [BCM]" when it responded by sending the September 17, 1997, letter to Asarisi and the Board, vigorously objecting to the Board's proposed reapplication of the Combiflex system to a test cell, *1266 rather than approval of Harbert's Liquid-Boot proposal.
The August 27, 1997, letter does not request that Harbert seal reactor basin #2. As we discussed in Part IV.C.1. above ("Anticipatory Repudiation"), the September 17, 1997, letter does not reflect Harbert's refusal to perform repair work as directed by the Board. Instead, the correspondence between the parties at that point in the dispute concerning the sealing of reactor basin # 2 reflects that the Board was attempting to verify whether the Combiflex system was appropriate for sealing reactor basin # 2 in the face of Harbert's and Spiderman's assertions that they had properly applied and/or attempted to repair the Combiflex system in accordance with the standard specifications and that the Combiflex system was not the appropriate product to use to seal the reactor basin. In addition, the August 27, 1997, letter was not sent "by registered mail," and it was not sent to Federal. Thus, we cannot conclude that the trial court erred by not treating the August 27, 1997, letter as a notice given pursuant to subsection 8.11.
The Board continues its argument by discussing the November 14, 1997, letter from Asarisi to Harbert. Again, that letter states:
"It appears that a number of items remain incomplete that will keep the new system from going on line when Reactor 2 is satisfactorily sealed and tested. Most if not all of the items are electrical (i.e. load shedding, etc.). In order to avoid further delays on this project we request that you provide an updated schedule which includes all work associated with starting the new system. This schedule should be in our office no later than November 24, 1997. Failure to provide a schedule within ten days will be grounds for finding [Harbert] in default of the Contract in accordance with [subsection] 8.11 of the Specifications."

The November 14, 1997, letter was sent by certified mail to Harbert and to Federal.
The Board argues that the incomplete items referred to in the November 14, 1997, letter are the "deficiencies identified" in Asarisi's August 27, 1997, letter, which included addressing the load-shedding work. The November 14, 1997, letter, however, does not purport to declare that the prior delays were grounds for proceeding under subsection 8.11. Rather, the November 14, 1997, letter states unequivocally that "[f]ailure to provide a schedule within ten days will be grounds for finding [Harbert] in default of the Contract in accordance with [subsection] 8.11 of the [Standard] Specifications."
Before the November 14, 1997, letter, Harbert was under no specific contractual obligation to produce the particular schedule of work required by that letter. Instead, that specific obligation was first imposed on Harbert by BCM, as the supervising engineer for the project, in the November 14, 1997, letter. Appropriately, therefore, the letter informs Harbert of this obligation and then merely states that failure to provide the requested schedule "within ten days will be grounds for finding [Harbert] in default of the Contract." It appears that neither Harbert nor Federal provided the requested schedule within 10 days, but the Board did not thereafter notify Harbert and Federal that it was actually declaring their failure to be a default under subsection 8.11, and it did not give them 10 days after such notice in which to cure the default before it terminated Contract 15. Thus, we cannot conclude that the trial court erred by not concluding that the November 14, 1997, letter satisfied the Board's obligation under subsection 8.11.
*1267 Based on the foregoing, we cannot conclude that the trial court erred by entering a summary judgment for Harbert and Federal on the Board's claims of breach of contract as to Contract 15.

V. Conclusion
Based on the foregoing, the March 2005 summary judgment against the Board and in favor of Harbert and Federal is due to be reversed insofar as it denied the Board's claims alleging breach of contract as to Contract 16. As to the Board's other claims, as described in the March 2002 amended and restated counterclaim and third-party complaint, the March 2005 summary judgment is due to be affirmed. This cause is hereby remanded to the trial court for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
COBB, C.J., concurs in the result.
MURDOCK, J., concurs in part and dissents in part.
MURDOCK, Justice (concurring in part and dissenting in part).
I concur in the main opinion with the exception of Part IV.A., as to which I respectfully dissent.
NOTES
[1] This is the Board's second appeal in this case. See Board of Water & Sewer Comm'rs of Mobile v. Bill Harbert Constr. Co., 870 So.2d 699, 701 (Ala.2003). The first appeal concerned the issue whether the trial court erred in denying the Board's motion to arbitrate Harbert's claims against it. We held that it did not.
[2] BCM subsequently changed names and ownership, but the changes are not relevant to this appeal.
[3] The reactor basin is a large containment vessel constructed of poured concrete walls, with a roof of pre-cast-double-T concrete beams. The reactor basin included an oxygen-dissolution system for the processing of waste. The system consisted, in part, of six electric aerators mounted on top of the reactor basin. The aerators turned blades that extended into the reactor basin and that mixed pure oxygen and bacteria into a waste sludge.
[4] As hereinafter discussed, some documentation indicates that the completion date for Contract 16, as extended, was April 28, 1996. An August 9, 1996, letter from a representative of BCM to Harbert states that the contract completion date, as extended, was May 2, 1996. See discussion, infra.
[5] The record contains a December 1, 1994, document from Sika that states that "Spiderman... has successfully installed Sika Products during the past few years. Based on their past history using Sika Products, we recommend them highly."
[6] According to deposition testimony from George Atchison, Jr., president of Phoenix Coatings, Inc., Spiderman did not install the Combiflex system properly. Eventually, the Board retained Phoenix Coatings to reinstall the Combiflex system after the initial installation repeatedly failed pressure tests; Phoenix Coatings' installation was not completed until after the Contract 15 was terminated, however. As hereinafter discussed, Spiderman disputed that its installation was at fault in the initial failure of the sealant system. It argued that the Combiflex system was not an appropriate sealant system for the reactor basin. Harbert ultimately agreed with Spiderman's position. See discussion, infra.
[7] Based on George Atchison's deposition testimony, see note 6 supra, it subsequently was determined that it was not possible to seal off one cell in reactor basin # 2 so as to allow for a pressure test of only that cell. Atchison stated, however, that the Combiflex system, if properly installed, was an appropriate product to seal the reactor basin, and Phoenix Coatings used the Combiflex system for the repair project on reactor basin # 2. We have not been directed to any portion of the record that reflects whether the reinstallation satisfied the original design pressure test, nor have we been directed to a portion of the record that reflects, with clarity, the degree to which Phoenix Coatings' reinstallation might have been based on specifications different from those in the original contract specifications or that fell outside the responsibility of Harbert and/or Spiderman under the original specifications.
[8] The parties have not directed us to any place in the record on appeal that provides further information regarding the September 24, 1997, meeting.
[9] It is evident that the language of the resolution does not correspond to the motion that the Board discussed and approved as recorded in the minutes of the Board's December 8, 1997, meeting. The above-quoted record of the minutes of that meeting contain no indication that the Board "moved, ratified, and affirmed" that Harbert be terminated, as opposed to being declared in default. There is no indication in the minutes or elsewhere in the record that, after approving BCM's recommendation to declare Harbert in default for failing to provide the schedule of completion requested in Asarisi's November 14 letter, the Board or BCM sent notice to Harbert advising it that this failure constituted a default under Contract 15 and giving Harbert 10 days notice under § 8.11 of the standard specifications to cure the default. Nonetheless, we assume, as we must, that the resolution correctly reflects what occurred at the December 8 meeting. See, "Standard of Review," infra.
[10] Apparently, an April 28 deadline was consistent with a 70-day extension. It appears, however, that the April 28 completion date was later revised to May 2, 1996.
[11] The parties have not discussed the content of the June 6, 1996, letter or otherwise indicated that it is included in the record on appeal.
[12] Sharpies supplied an Eddy-Current-Brake backdrive and apparently guaranteed the performance of the sludge-system centrifuges.
[13] The list also included items such as the installation of a motion detector on "Conveyor M-110"; "[c]omplete testing of all control functions and alarms"; providing numerous spare parts; conducting performance tests and on several items; identifying and labeling all lines; installing certain gauges; purchasing and installing a computer; installing air conditioners on certain instrument and control panels; "running" lights for the main drive and back-up drive on the centrifuge control panels; installing solenoid valves on certain piping; "labeling and tagging" various equipment and instruments; providing a grounding conductor on several items of equipment and on nonmetallic conduit; furnishing a "motor disconnect or lock-out"; and providing numerous certifications.
[14] Asarisi was apparently referring to the April 2, 1997, letter to Harbert, discussed above.
[15] The underlying case involved numerous other claims between or involving parties other than Harbert, Federal, and the Board, including Spiderman, Sika, and BCM. Some of those claims have been settled and those remaining are not at issue in this appeal.
[16] The discussion of the Board's claims reflects those claims alleged in the Board's March 2002 amended and restated counterclaim and third-party complaint, which was the last amendment the trial court allowed before it entered a summary judgment against the Board.

We note that in addition to the claims described in the text of this opinion, the Board also included claims alleging that Harbert was liable to it because of "[t]he negligence of Harbert and its subcontractors" based upon Harbert's failure to provide appropriate concrete for reactor basin # 2, which allegedly contributed to the failure of the sealant system and for negligent performance of the work under the contracts (i.e., breach of an alleged "duty to perform th[e] work in a workmanlike manner"). Further, the complaint included claims of breach of an implied warranty and a claim based upon allegations that Harbert was liable to the Board for breaches of Harbert's bond obligations associated with the contracts. The Board makes no argument on appeal relating to its negligence claims, breach-of-implied-warranty claims, and breach-of-bond-obligations claim.
[17] The fraud allegations in the March 2002 amended and restated counterclaim and third-party complaint appear to allege fraud in the inducement.
[18] The record reflects that the trial court did not rule on the Board's motion to allow a fourth amendment to the complaint before entering the summary judgment that is the subject of this appeal. The proposed fourth amendment is not before us in this appeal.
[19] We have not been asked to address the propriety of the summary judgment as to the Board's claims sounding in negligence or implied warranty or as to the claims relating to Harbert's, as opposed to Federal's, bond obligations. See note 16, supra. See Muhammad v. Ford, 986 So.2d 1158, 1165 (Ala.2007) ("`An argument not made on appeal is abandoned or waived.'" (quoting Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1124 n. 8 (Ala.2003))). Likewise, the Board does not argue that the breach of Contract 15, which Harbert alleges was committed by the Board (i.e., terminating the contract without first complying with the notice provision in subsection 8.11), does not prevent the Board from recovering damages for defective performance by Harbert because, as the arguments would go, Harbert's defective performance occurred before the Board's breach and/or because such defects in performance were of a nature that they could not have been remedied within a 10-day cure period. See Dunlap v. Regions Fin. Corp., 983 So.2d 374, 378 (Ala.2007) (stating the well-settled principle that it is not the function of this Court to make and address legal arguments for the appellant).
[20] No issue is presented on appeal as to whether the manner of termination of Contract 16 was in accordance with terms of the contract.
[21] The Board devotes part of its initial brief to this Court to an argument that Harbert failed to establish the second and third elements of a breach-of-contract claim as identified in Winkleblack v. Murphy, 811 So.2d 521 (Ala.2001):

"`A plaintiff can establish a breach-of-contract claim by showing "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages."'"
811 So.2d at 529 (quoting State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 303 (Ala. 1999), quoting in turn Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995)).
This argument goes to Harbert's ability to recover on its breach-of-contract claims against the Board. The trial court did not enter a summary judgment in favor of Harbert as to these claims. Nor did the trial court determine that Harbert had performed its obligations under Contract 15. It may be that Harbert breached Contract 15 such that it cannot establish its own prima facie case of breach of contract by the Board. This is a separate issue from the issue upon which the trial court has ruled, i.e., whether the Board's claims against Harbert alleging breach of Contract 15 were barred by the Board's own procedural default under Contract 15.
[22] In its reply brief, the Board argues that Asarisi's August 27, 1997, letter to the Board "told Harbert to seal Reactor Basin 2 using the methods called for in Contract 15." In support of this statement, they refer this Court to the page of the appellate record where a copy of the August 27, 1997, letter is located and to certain deposition testimony from Asarisi. Neither the letter nor Asarisi's deposition testimony reflects that BCM had directed Harbert to repair reactor basin # 2 using the Combiflex system after Harbert had attempted the initial repairs in the early summer of 1997. As to those repair attempts, we note that Harbert's July 14, 1997, letter to Asarisi states that Harbert "fully complied with [the contract specifications] in implementing a repair procedure based on using the stipulated combiflex polyurethane sealant system manufactured and installed by the Sika Corporation" but that the "repairs have not yielded the expected and intended results that everyone envisioned." Harbert thus proposed that BCM approve an alternative sealant system because Harbert had "thoroughly exhausted all required means and methods in performing this repair work in accordance to the contract documents and as directed by... BCM."
[23] The Board argues for the first time in its reply brief that, because the provisions of the bond for Contract 15 did not require that it provide Harbert or Federal with notice of default, it could recover under the bond agreement, despite any noncompliance with subsection 8.11. "[T]his Court does not address issues raised for the first time in a reply brief." Byrd v. Lamar, 846 So.2d 334, 341 (Ala.2002).

Also, the Board argues in its appellate brief that it had paid Harbert all but approximately $248, 288 of the $11,106,963 contract price under Contract 15 and that, therefore, it "[c]learly ... substantially complied with its obligations and ... [the] second element [its breach-of-contract claim] was satisfied; i.e., that the Board prove its performance under the contract." This argument does not address the basis for the trial court's judgment as to the termination of Contract 15. The trial court concluded that the Board had no right to terminate Contract 15 without first strictly complying with subsection 8.11. The Board's argument does not explain how substantial performance of the payment terms of the contract (assuming the doctrine of substantial performance applies as suggested by the Board) would excuse the material breach of subsection 8.11 for purposes of establishing the second element of a breach-of-contract claim. The Board cites no authority that supports such a conclusion. Thus, we do not address the issue. See Dykes, supra; Rule 28(a)(10), Ala. R.App. P.
[24] In its January 2004 order granting Harbert's motion for a partial summary judgment, the trial court concluded that where "a contract explicitly states how notice of default should be given, the owner must strictly comply with the contract requirements" and that "[n]otice to terminate must be clear and unambiguous, reasonable, and in accordance with the terms of the contract." In support of these conclusions, the trial court cited certain sections of Corpus Juris Secundum and Bank of Brewton, Inc. v. International Fidelity Insurance Co., 827 So.2d 747, 754 (Ala.2002), which discusses notice requirements as to an action against a surety. The Board does not argue that the legal standard applied by the trial court was incorrect.
[25] In its appellate brief, the Board does not dispute the trial court's conclusion that the notice requirement of subsection 8.11 was not satisfied by the Board's undated resolution terminating Contract 15 or by Asarisi's letter of December 9, 1997.
[26] As noted, the Board does not argue in its initial appellate brief that subsection 8.12 provided an alternative means for terminating Contract 15 that could be used in lieu of subsection 8.11. Given the parties' dispute before the trial court concerning the application of subsection 8.12, the number of legal principles this Court would have to consider in determining the relationship between subsection 8.11 and 8.12, and the fact that Harbert and Federal have not had an opportunity to address any argument as to the pertinence of subsection 8.12 because the Board raised that argument for the first time in its reply brief, we decline to address the Board's argument concerning the application of subsection 8.12. See Byrd v. Lamar, 846 So.2d 334, 341 (Ala.2002) (stating the well-settled general principle that this Court will not address issues raised for the first time in a reply brief).
[27] The Board attempts to characterize Harbert's August 18, 1997, letter to Asarisi as a refusal to correct the 19 items described in Asarisi' August 14, 1997, letter. As previously discussed, the August 18, 1997, letter from Harbert to Asarisi states:

"Based on the results of the inspection and Mr. Shutz's assessment thereof, it is the position of ... Harbert ... that ... BCM will now have to select an appropriate alternative method [to seal reactor basin # 2].
"We trust that ... BCM will provide the appropriate repair method accordingly to minimize any further delays that have occurred to the project as a result of this matter. For the record, all work on Reactor No. 2 ceased August 13, 1997. We look forward to receiving a positive response from ... BCM no later than August 22, 1997."
Based on the language used in Harbert's August 18, 1997, letter and subsequent correspondence from Harbert, it is clear that that letter is referring to a work stoppage on any attempt to seal reactor basin # 2 pending the resolution of the dispute regarding the proper repair method, not to the 19 items described in Asarisi's August 14, 1997, letter.